SAMUEL J. LEFRAK AND ETHEL LEFRAK, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Lefrak v. Commissioner
Docket No. 20525-86
United States Tax Court
T.C. Memo 1993-526; 1993 Tax Ct. Memo LEXIS 536; 66 T.C.M. (CCH) 1297; November 16, 1993, Filed *536 Decision will be entered under Rule 155. For petitioners: Richard A. Levine, Carlton M. Smith, Albert Rosenblum, and Michael S. Kutzin. For respondent: George Soba, Nancy Chassman Rothbaum, Donald Schwartz, and Mark A. Ericson. WHALEN
WHALEN
MEMORANDUM FINDINGS OF FACT AND OPINION WHALEN, Judge: Respondent determined deficiencies in Federal gift tax against each petitioner for the taxable quarter ended December 31, 1976, in the amount of $ 342,658. By amendment to the answer in the instant case, respondent increased the deficiencies determined in the notice of deficiency by $ 73,229 for each petitioner. The issues presented for decision in the instant case are as follows: (1) Whether the interests transferred to several donees by petitioner Samuel J. LeFrak [1] were interests in partnerships or in real property; (2) the value of the buildings in which interests were transferred; and (3) whether petitioners are entitled to a discount for minority interest and lack of marketability in valuing the transferred interests. Unless otherwise indicated, all section references are to the Internal Revenue Code as in effect on the date of the gifts, and all Rule references are to the Tax *537 Court Rules of Practice and Procedure. FINDINGS OF FACT Some of the facts and certain documents have been stipulated for trial pursuant to Rule 91. The stipulated facts are found accordingly and are incorporated herein by reference. Petitioners are husband and wife, and resided in Woodmere, New York, at the time the petition in the instant case was filed. Petitioner is a builder, developer, and manager of rental real estate in New York City, and held interests in over 200 parcels of real property during 1976. Petitioner's buildings were held in corporate, partnership, and sole proprietorship form, and were operated through the LeFrak Organization, which petitioner directed and controlled. Toward the end of 1976, because petitioner was aging and because real estate values in New York City were low due to poor economic conditions, petitioner decided to make gifts to his children, Richard LeFrak, Jacqueline LeFrak, Francine *538 LeFrak, and Denise LeFrak Bandier. On December 30, 1976, for the purpose of making gifts, petitioner conveyed interests in 22 buildings, consisting of 20 apartment buildings and two office buildings located in the boroughs of Queens and Brooklyn (hereinafter sometimes referred to as the buildings), to his children individually or to trusts created for their benefit. The apartment buildings were subject to New York City's rent stabilization laws, while the office buildings were not. Prior to the conveyances, 20 of the buildings were held by petitioner individually and operated as sole proprietorships, and 2 were held by partnerships in which petitioner held a 96-percent interest and his children, or trusts for their benefit, held the remaining 4 percent. On December 30, 1976, petitioner formed 20 partnerships with his children or their trustees. Each of the partnerships was to own and operate one of the 20 buildings which were formerly held by petitioner individually as sole proprietorships. Each of the buildings was conveyed to petitioner and the donees as tenants in common, "d.b.a." (doing business as) the particular partnership formed to hold the respective building conveyed. *539 The deeds were recorded on December 30, 1976. A Business Certificate for Partners for each partnership was filed with the County Clerk of Queens County on December 30, 1976. Petitioner conveyed to each donee a 7.5-percent interest in each of the buildings, subject to the outstanding mortgages. The conveyances of the buildings were made to Richard LeFrak individually, and to trusts for the benefit of each of petitioner's daughters, of which petitioners and another individual were the trustees. [2] Accordingly, after the conveyances, petitioner owned a 70-percent interest while the donees together owned the remaining 30 percent. With respect to the two buildings which were held in partnership form prior to the transactions in issue, petitioner conveyed a 6.5-percent interest in each such building to each donee, subject to the outstanding mortgages, the conveyances to Richard and Denise being made to *540 them individually and the conveyances to Francine and Jacqueline being made to their trusts. As each such donee had previously held a 1-percent interest, after such conveyances, petitioner owned a 70-percent interest and the donees together owned the remaining 30 percent. In addition to the buildings, prior to the transactions in issue, each of the 20 sole proprietorships and two partnerships controlled by petitioner held non-real-estate assets, such as cash, marketable securities, and other liquid assets, and owed some liabilities, such as accrued mortgage interest, as well. Petitioner did not intend to give the non-real-estate assets of such entities to the donees, although they were conveyed to the newly formed partnerships, and all income from such non-real-estate assets was specially allocated to him. All of the buildings were encumbered by mortgages with varying interest rates, times to maturity, and other terms. The total mortgage indebtedness against the buildings as of December 31, 1976, was $ 25,336,206. The buildings were valued as of December 30, 1976, and, to the extent that the value placed on any of the buildings was less than its outstanding mortgage balance, *541 petitioner made a contribution of cash or marketable securities from the sole proprietorship holding the building to the respective partnership capital so that the assets of each of such partnerships owning the buildings equaled or slightly exceeeded the respective partnership's liabilities. Seventy percent of the rental income of each partnership was allocated to petitioner, while each donee received an allocation of 7.5 percent. Petitioners' son, Richard, petitioner individually, and petitioners as trustees for petitioners' children, Denise, Francine, and Jacqueline, [3] executed partnership agreements dated January 1, 1977, which placed certain restrictions upon the partnership interests covering the buildings. The agreements recited that the partnerships holding the buildings were formed on December 30, 1976. Petitioner was designated managing partner, and was given complete power to conduct the partnerships' business affairs without the necessity of obtaining the consent of the other partners. No partner was able to assign or encumber his partnership interest without the consent of all of the partners, except upon the partner's retirement from the partnership. Each partner *542 covenanted not to seek partition of the partnership property. No partner was allowed to make any withdrawals from the partner's capital account without the consent of all of the partners. Petitioners elected to "split" the gifts of the buildings for Federal gift tax purposes, treating petitioner's gifts on their gift tax returns as if each of them had made one half of such gifts. The buildings were valued for purposes of preparing gift tax returns in the total amount, net of mortgages, of $ 255,000, and the gifts were valued at $ 59,925. Respondent determined in the notice of deficiency that the buildings should be valued at the total amount of $ 34,822,000 and that the gifts should have been valued in the net amount of $ 2,629,556. OPINION Section 2501 provides for a tax on gifts by individuals. Section 2512(a) provides that, in the case of a gift of property, its value at the date *543 of the gift shall be considered the amount of such gift. Accordingly, the principal issue we must decide in the instant case is the value of the buildings conveyed on December 30, 1976, by petitioner to his children, or the trusts of which they were beneficiaries. [4]
The law with respect to the value of property for gift tax purposes is well developed. The issue is one of fact, and all factors bearing on such issue must be considered. Silverman v. Commissioner, 538 F.2d 927, 931 (2d Cir. 1976), affg. T.C. Memo. 1974-285; Hamm v. Commissioner, 325 F.2d 934, 938 (8th Cir. 1963), affg. T.C. Memo. 1961-347; Estate of Jephson v. Commissioner, 87 T.C. 297, 303 (1986). *544 Although we must consider the entire record, we have broad discretion in selecting a method of valuation, Estate of O'Connell v. Commissioner, 640 F.2d 249, 251 (9th Cir. 1981) affg. on this issue T.C. Memo. 1978-191, and the weight to be given the facts in reaching our conclusion because "finding market value is, after all, something for judgment, experience, and reason". Colonial Fabrics, Inc. v. Commissioner, 202 F.2d 105, 107 (2d Cir. 1953), affg. a Memorandum Opinion of this Court dated January 22, 1951. Because valuation is necessarily an approximation, the figure at which the Court arrives need not be one as to which there is specific testimony, if it is within the range of figures that may properly be deduced from the evidence. Silverman v. Commissioner, supra at 933; Alvary v. United States, 302 F.2d 790, 795 (2d Cir. 1962). The regulations promulgated under section 2512 provide the standard to be used in fixing the value of the donated property: The value of the property is the price at which such property would *545 change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell, and both having reasonable knowledge of relevant facts. The value of a particular kind of property is not the price that a forced sale of the property would produce. Nor is the fair market value of an item of property the sale price in a market other than that in which such item is most commonly sold to the public, taking into account, the location of the item wherever appropriate. * * * [Sec. 25.2512-1, Gift Tax Regs.] The willing buyer-willing seller standard generally is used in valuing gratuitously transferred property. United States v. Cartwright, 411 U.S. 546, 551 (1973). The standard is an objective test using hypothetical buyers and sellers in the marketplace, and is not a personalized one which envisions a particular buyer and seller. Estate of Andrews v. Commissioner, 79 T.C. 938, 956 (1982); Kolom v. Commissioner, 71 T.C. 235, 244 (1978), affd. 644 F.2d 1282 (9th Cir. 1981). Furthermore, the value of a gift is measured by the value *546 of the property passing from the donor, not according to what the donee received. Estate of Bright v. United States, 658 F.2d 999, 1001, 1006 (5th Cir. 1981); Connecticut Bank & Trust Co. v. United States, 439 F.2d 931, 935 (2d Cir. 1971); Goodman v. Commissioner, 156 F.2d 218, 219 (2d Cir. 1946), affg. 4 T.C. 191 (1944); Ward v. Commissioner, 87 T.C. 78, 100 (1986); Cullman v. Commissioner, T.C. Memo. 1981-666; sec. 25.2511-2(a), Gift Tax Regs. Where the donated property is encumbered by a mortgage, the value of the gift is measured by the equity in the property remaining after deduction of the mortgage indebtedness. Laughinghouse v. Commissioner, 80 T.C. 425, 430 (1983). As is customary in valuation cases, the parties have relied extensively on expert opinion evidence to support their respective values of the interests in the buildings under the willing buyer-willing seller standard. We evaluate opinion evidence in the light of the qualifications of the expert and *547 all other evidence of value. Parker v. Commissioner, 86 T.C. 547, 561 (1986). We are not, however, bound by the formulas or opinions proffered by expert witnesses, especially when they are contrary to our judgment, but we may reach a decision on value based on our own analysis of all the evidence in the record. Silverman v. Commissioner, 538 F.2d at 933; IT&S of Iowa, Inc. v. Commissioner, 97 T.C. 496, 508 (1991). While we may adopt the opinion of an expert in its entirety, Buffalo Tool & Die Manufacturing Co. v. Commissioner, 74 T.C. 441, 452 (1980), we may be selective in the use of any portion of such an opinion. Parker v. Commissioner, supra at 562. Characterization of the Interests Transferred
Before we proceed to value the gifts made by petitioner, however, a dispute must be resolved as to exactly what type of interest petitioner gave to the donees. Petitioners contend, and respondent determined in the statutory notice of deficiency, that petitioner transferred partnership interests to the donees. After the *548 pleadings were filed, however, respondent amended the answer to assert that petitioner actually transferred fractional interests in the real estate, rather than partnership interests. As the issue is a new matter, respondent bears the burden of proving the allegation. Rule 142(a). The question of what type of interest petitioner conveyed to the donees is controlled by New York law. United States v. National Bank of Commerce, 472 U.S. 713, 722 (1985); Morgan v. Commissioner, 309 U.S. 78, 82 (1940); Ward v. Commissioner, supra at 91-92. Respondent's contention is based on the fact that the deeds conveying the buildings named petitioner and the donees as grantees and that they held the buildings as tenants in common. Respondent also argues that petitioner's treatment of each of the transactions for financial, accounting, and tax purposes was consistent with a transfer of real estate, not partnership interests. Respondent contends that the buildings were conveyed to the partnerships subsequent to the gifts in issue, arguing that petitioner was the sole owner of 20 of the buildings when *549 he made the gifts. Petitioners contend that the partnerships were created on December 30, 1976, when petitioner executed and filed the partnership certificates. Petitioners contend the 20 buildings, formerly held solely by petitioner, were conveyed to new partnerships created simultaneously with the conveyances, and that petitioner gave interests in the respective partnerships to the donees. Petitioners argue that the conveyances and creation of the partnerships constituted an integrated transaction, which should be taken together under the step transaction doctrine, and that the order in which the papers were signed should not control the characterization for tax purposes. Petitioners point out that the deeds state that the grantees are "d.b.a." the partnership holding the respective building, which indicates that the building was transferred to and was held by a partnership, and that the owners are not actually tenants in common. Petitioners state that the reason for the form of the deeds was to avoid imposition of New York City real estate transfer taxes, which would have been imposed upon a conveyance of the buildings to a partnership, even one made up of members of a single *550 family. Respondent disputes that transactions in the manner utilized by petitioners were necessary to avoid imposition of either New York State or City transfer taxes. Based on the evidence in the record in the instant case, we hold that the conveyances were interests in real property, rather than interests in partnerships. Although it is clear that, after the transactions were completed, the buildings were held in partnerships, such circumstance does not establish that petitioner gave his children partnership interests. Accepting petitioners' argument would require us to conclude that there is such a thing as a one-person partnership, a proposition we decline to accept in the instant case. Under New York law, a partnership consists of "an association of two or more persons to carry on * * * a business for profit." N.Y. Partnership Law sec. 10(1) (West 1988). Consequently, in New York, a partnership can come into being only upon the association of two or more persons with the requisite intent. Petitioner therefore could not have created partnerships by himself before transferring an interest in them to his children, as petitioners appear to contend. [5]
*551 Petitioners do not contend that petitioner gave his children interests in the sole proprietorships which previously held the buildings. [6] The transactions consequently appear to have had only two components: The conveyance of the buildings and the creation of the partnerships. Petitioners must be taxed in accordance with the form in which the transaction was actually cast, not in another form which could have been used by them. Commissioner v. National Alfalfa Dehydrating & Milling Co., 417 U.S. 134, 148-149 (1974). Accordingly, there are only two potential characterizations of the transactions: First, that petitioner agreed to form partnerships with his children and then conveyed the buildings to such partnerships, and second, that petitioner conveyed interests in the buildings to his children, which were subsequently conveyed to the partnerships or operated under the partnership agreement. *552 The interests in the buildings were the most significant component of the gift and form the primary determinant of the value of the gifts at the time they were conveyed. If, as petitioners contend, petitioner and his children agreed to form partnerships before or concurrently with the conveyance of the buildings and other assets and liabilities, the value of the interests conveyed would turn on the net value of the assets transferred, because such assets gave the partnership interests their value. The mere agreement to form a partnership would not have had any value in the absence of the assets which were to be transferred to such partnership. Consequently, we hold that the thing of value which petitioner possessed at the time of the gifts, and which he thus transferred, was his interest in the buildings. Our conclusion is bolstered by the principle noted above, that the gift tax is imposed on what the donor transferred, not what the donee received. Estate of Bright v. United States, 658 F.2d 999, 1001, 1006 (5th Cir. 1981); Connecticut Bank & Trust Co. v. United States, 439 F.2d 931, 935 (2d Cir. 1971); Goodman v. Commissioner, 156 F.2d at 219; *553 Ward v. Commissioner, 87 T.C. at 100; Cullman v. Commissioner, T.C. Memo. 1981-666. With respect to the two buildings held by partnerships prior to the transactions in question, it appears that such gifts also consisted of interests in real estate. Documentary evidence in the record indicates that the preexisting partnerships were dissolved and reconstituted in the gift transactions. [7] Partnership agreements dated January 1, 1977, which were identical to those made with respect to the other buildings petitioner conveyed to the donees, recited that partnerships to hold such buildings had been formed on December 30, 1976. Structuring the transactions thusly would have permitted petitioner to avoid transferring an interest in the liquid assets of the old partnerships, which petitioner did not want to do, and to limit the gifts to an interest in the real estate assets of such partnerships. [8] Furthermore, even if the old partnerships were not dissolved, such circumstances limit the value of the gift to the additional shares in the partnership real estate received by the donees. Accordingly, the principal determinant of *554 the value of the gifts was the net value of the real estate interests transferred, and we will accordingly determine the value of the gifts on such basis. [9]
*555 The experts premised their valuations upon the characterization of the interest transferred espoused by the respective parties on whose behalf they appeared. Petitioners' experts valued the gifts on the assumption that partnership interests were transferred, and respondent's expert valued the gift on the basis that fractional interests in real property were transferred. We do not consider, however, that such differing approaches will by themselves invalidate the conclusions of the experts as to the value of the real estate which was the subject of the transfer. Where an expert's report is based upon incorrect assumptions, the Court may still be able to use it to construct reliable estimates of value by adjusting for the faulty assumptions. Anselmo v. Commissioner, 80 T.C. 872, 884-885 (1983), affd. 757 F.2d 1208 (11th Cir. 1985). Both parties' experts devoted considerable attention to the proper valuation of the buildings, and treated such value as the principal determinant of the value of the gifts. The different characterizations of the interests conveyed will make a difference with respect to the amount by which the *556 interests in the buildings are to be discounted to take account of the fact that the interests were fractional or minority interests and for the lack of marketability of such interests at the time of the gift. The calculation of such discounts by petitioners' expert was premised upon assumptions which were not well founded, and so we have not accepted their expert's calculations of discounts. See Estate of Newhouse v. Commissioner, 94 T.C. 193, 243-244 (1990). Accordingly, we will proceed to consider the value of interests in the buildings petitioner conveyed to the donees. Valuation of the Buildings
Both experts agreed that, because the buildings were of an income-producing nature, they should be valued on the basis of their income-generating capacities. Proceeding on such basis generally produces the most reliable estimate of the value of commercial property. United States v. Dresser Industries, Inc., 324 F.2d 56, 59 (5th Cir. 1963); Lynch v. Commissioner, T.C. Memo. 1983-173. Each expert developed a value based on the present worth of the future stream of income which each *557 of the buildings was expected to generate, taking the amount of estimated future net income and discounting it by a factor reflecting the cost of capital. The experts, however, differed substantially in their assumptions concerning future economic conditions and the figures to be used in their calculations. Petitioners' expert, Mr. Levy, used the income capitalization method, assuming that the future stream of income produced by the buildings would be constant, and that no increases in income or appreciation in the buildings could be projected due to the condition of the New York City economy and the rent stabilization laws to which the apartment buildings were subject. To calculate value, Mr. Levy developed a stabilized net income figure based on actual 1976 receipts and expenses. Receipts were derived from actual collections and, for most operating expenses, Mr. Levy used stabilized 1976 expenses, at which Mr. Levy apparently arrived by rounding the 1976 actual expense to the nearest 100 dollars. For certain categories of expenses, namely, maintenance, repairs, and painting, which could experience fluctuations from year to year, Mr. Levy developed an estimated level of expense *558 based on the actual figures for 1974, 1975, and 1976. Mr. Levy also added a $ 35 per apartment charge as a replacement reserve for appliances. Mr. Levy thus calculated net operating income as if the property were free and clear of the mortgage, taking the cost of debt financing into account in deriving the capitalization rate to be used in discounting the net income. To determine the capitalization rate, Mr. Levy used the mortgage-equity method, which produces a weighted average cost of capital based on the cost of debt and equity financing for the subject property. For purposes of estimating the cost of mortgage financing, Mr. Levy assumed that a buyer would obtain a 25-year self-amortizing mortgage for 70 percent of the value of the property at the rate prevailing at the date of the gift, which he concluded was 9.5 percent. Mr. Levy then estimated the rate of return which an owner would demand for the equity financing for the remaining 30 percent of the property, considering the characteristics of each building and the fact that the landlord provided all utilities. For the office buildings, Mr. Levy used a 60-percent debt and 40-percent equity financing assumption. Mr. Levy *559 also applied a sinking fund factor to take account of the change in the debt and equity financing mix caused by amortization of the mortgage over the holding period. The weighted average of the two rates yielded the capitalization rate, which Mr. Levy used to discount the estimated future net income over an assumed 10-year holding period. Mr. Levy also increased the value of certain buildings which carried assumable mortgages by a "mortgage benefit" factor. Such factor reflected the value of cost savings which a buyer could realize by assuming the existing mortgage, which bore a below-market interest rate, rather than by financing at prevailing market rates. Finally, Mr. Levy subtracted the amount of the mortgage outstanding on the valuation date from the overall value computed under the income capitalization approach to arrive at the value of the equity in the building. Certain of the buildings had no net equity value when valued under the foregoing method, so Mr. Levy used a net cash-flow analysis, which valued the stream of income left over after payments on the existing mortgage were made. The theory of such method was that a buyer would pay to acquire such stream of income, *560 and then abandon the property to the mortgagee when the balloon payment on the mortgage fell due. Mr. Levy used a 15-percent discount factor for all but one of the buildings, using a 10-percent factor for such building. Mr. Levy then added back a 20-percent "entrepreneurial factor" to account for a possible rebound in the market which might make it feasible to refinance the building. Mr. Levy used the higher of the values produced by the two methods, but valued each property at $ 10,000 even where both methods yielded a value below such figure. Using the foregoing method, Mr. Levy concluded that the total value of the buildings, before reduction for outstanding mortgage indebtedness, was $ 26,170,000. After applying his three alternative methods for valuing the residue after mortgage indebtedness was taken into account, he concluded such equity totaled $ 2,052,063. Respondent's expert, Mr. Stehm, used the discounted cash-flow method, which, given his assumptions that net income would rise in the future and that the buildings would increase in value, was appropriate because such method is designed to value a nonuniform income stream. To develop his estimates of income and expense *561 for each of the buildings, Mr. Stehm relied upon actual results for 1973 to 1976, but he also consulted national, regional, and New York City surveys to determine if his expense ratios were accurate. To develop his estimates of effective gross receipts, Mr. Stehm started with 1976 receipts, and generally increased them by 3 to 5 percent per year over the projected 10-year holding period, with a 1-percent reduction for vacancy and collection losses. The effective gross income was also reduced by a 1-percent replacement reserve. Such income was then reduced by the expense ratio, which remained constant for a particular building over the projected holding period. Mr. Stehm's expense ratios for each building essentially consisted of a rounded average of the actual expense ratios for such building for 1973 through 1976. Having thus estimated the net income for each year of the holding period, Mr. Stehm reduced it to present value by applying a capitalization rate. Such rate was calculated under the mortgage-equity method, which determined the appropriate rate based on a weighted average cost debt and equity financing. Mr. Stehm assumed that a purchaser would finance 75 percent of *562 the building's value with debt, and 25 percent with equity. [10] Mr. Stehm assumed that mortgage interest rates would be between 9.5 and 10 percent, based on a 25-year self-amortizing obligation, and that the equity rate of return would be .25 to 1.5 percent above the mortgage rate. Mr. Stehm also included a factor to take account of expected appreciation in the property over the holding period, as well as a sinking fund factor to take account of the change in the debt/equity financing mix due to mortgage amortization. Using the foregoing method, Mr. Stehm concluded that the total value of the buildings, before reduction for mortgage indebtedness, was $ 36,650,900. After taking into account the $ 25,336,206 in total outstanding mortgage indebtedness, he concluded that the net equity in the buildings was $ 11,314,694. As the foregoing figures show, the experts reached widely differing opinions of value on the basis of their respective methodologies. *563 Most of the difference between their valuations, however, is traceable to their differing assumptions as to future appreciation and increases in net income for the buildings. The parties raise numerous objections to each of the assumptions made by the experts in each step of the valuation methodology described above. Accordingly, we will consider each set of assumptions. Potential for Appreciation of the Buildings
The value of the gifts is affected by the general condition of the New York economy at the time the gifts were made because of the economy's effect on the demand for rental housing and the ability of tenants to pay the rent sought for the buildings. Local economic factors would affect the prospects for appreciation in the value of the buildings. Petitioners contended that the condition of the local economy was such that a hypothetical buyer would not expect that the buildings would appreciate over the projected holding period, and their expert, Mr. Levy, valued the buildings on the basis of that assumption. Respondent, however, argues that local economic conditions were expected to improve at the end of 1976, and Mr. Stehm valued the buildings on the assumption *564 that they would appreciate in value by 10 to 20 percent over the projected holding period. After due consideration, we conclude that the buildings should not be valued on the basis of the assumption that they would appreciate over the projected holding period. Petitioners offered the expert testimony of Dr. Herbert Bienstock, professor of labor and urban values at the City University of New York, Queens College and former Regional Commissioner of Labor Statistics for the United States Department of Labor, to support Mr. Levy's conclusion. In Dr. Bienstock's opinion, the New York City's economy was in a disastrous state at the time of the gifts, and its future prospects as of the end of 1976 were bleak. Dr. Bienstock based his assessment on the following factors: The loss of 650,000 jobs in the city between 1969 and 1976; a shift in economic activity from the city to the suburbs; a decline in manufacturing jobs and a shift to service-oriented industries; a decline in the city's population; the outmigration of older, middle class residents and their replacement by young, poor, and uneducated individuals; and a large increase in workers who commuted to New York City but did not live *565 there. Furthermore, due to an erosion of the city's tax base attributable to the foregoing trends, the city was in a fiscal crisis, and faced the possibility of bankruptcy. Dr. Bienstock found that the deteriorated condition of the New York City economy adversely affected real estate values in the city due to reductions in demand for residential space. Dr. Bienstock stated, however, that rent control had caused a shrinkage in the amount of rental housing stock during the 1960's and 1970's, which prevented a huge oversupply of rental housing and price war during the period in issue. The city's heavy debt and financial problems also raised uncertainty concerning future real estate taxes, which are often used to close budget deficits. Based on his assessment of the condition of the New York City economy in 1976, Dr. Bienstock concluded that the outlook for the New York City economy was bleak for the remainder of the 1970's, and that business decision making was affected not only by the existing economic collapse, but also by the likelihood that job losses in the city would continue into the 1980's. Accordingly, at the time of the gifts of the buildings, a reasonable buyer would *566 not have expected that the value of the buildings would experience steady increases, as assumed by Mr. Stehm. Furthermore, such economic conditions would have foreclosed the expectation that net income of the two office buildings would increase over the projected holding period. While respondent points to some general statements made around the end of 1976 that the real estate outlook was expected to improve, we are more persuaded by the specific evidence in Dr. Bienstock's report as to the downward trend in the New York City economy, which could be expected to have a continuing adverse effect on real estate values in the City. Whether Increases in Net Income Can Be Projected in Valuing the Buildings
Another point on which petitioners' and respondent's experts disagree is whether to take into account potential increases in future net income yielded by the buildings in valuing them. Mr. Levy concluded that no such increases should be considered because the rent stabilization laws in effect in New York City at the time of the gifts precluded landlords from obtaining rent increases beyond the level of their expense increases, and sometimes did not even allow rent to keep pace *567 with rising expenses. Respondent's expert, however, generally factored in a net income increase of 3 to 5 percent per year in his valuation, finding that owners of rental buildings in New York City did experience increases over the periods in question. After due consideration, we are persuaded by Mr. Levy that the expectation of increases in net income was unrealistic given the rent stabilization laws in effect at the time of the gifts. The apartment buildings were subject to New York City's rent stabilization laws, which prohibited landlords from increasing rents beyond periodic uniform percentage increases set by the New York City Rent Guidelines Board (the Board). The rent stabilization laws are designed to limit a landlord's rent rises to the increase in expenses, and do not allow for increases in net income. Allowable increases in rent are determined according to changes in price indices prepared by the U.S. Bureau of Labor Statistics for certain goods and services used by landlords. The Board, however, also had to consider political pressures exerted by tenants, and could not permit increases which would be offensive to tenants. Petitioner's expert, Dr. Bienstock, who *568 was the Regional Commissioner of Labor Statistics at the time of the gifts, stated in his expert report on the 1976 New York City real estate market that, under rent control, rent increases which the Board allowed to landlords had not kept up with cost increases, and that as a result, thousands of buildings had been abandoned. Accordingly, petitioners argue the law was designed and applied to prevent landlords from obtaining increases in net income. Prior judicial construction of the rent stabilization laws corroborate petitioners' evidence as to such laws' purpose. The U.S. District Court for the Southern District of New York has held: The Rent Stabilization Law of 1969 was enacted explicitly for the benefit of New York City tenants as a means to control a perceived penchant toward unreasonably high rent increases on the part of landlords. * * * * * * Tenants are unquestionably the intended beneficiaries of the New York City rent control laws, and the benefit of which they partake is a carefully controlled system of rent increases -- one which is continuously solicitous of the tenant interest, to a substantial extent irrespective of the financial effect on the landlord. *569 [Gramercy Spire Tenants' Association v. Harris, 446 F. Supp. 814, 825-826 (S.D.N.Y. 1977).]
Respondent points to a 1989 memorandum prepared by the Executive Director of the Board, which states that landlords experienced an increase in net income from 1970 to 1982, in support of her view that increases in future net income should be factored into the valuation. Such statement does not, however, indicate when the increases occurred, and, accordingly, it is not helpful to us in deciding whether a willing buyer would have taken potential increases in net income into account on the date of the gifts. Furthermore, it appears to us that any such increase would have prompted corrective regulatory action. In the early 1970's, a law liberalizing the rent stabilization regime prompted a sharp increase in rents for decontrolled units in New York City, causing the city to declare a housing emergency in 1974, thus reimposing rent stabilization. Id. at 825. Accordingly, given the regulatory environment in New York City at the time of the gifts, we conclude that a willing buyer and willing seller would not have valued the subject *570 buildings on the basis of an expectation that their net income would rise in the future. Capitalization or Discount Rate
Both Mr. Levy and Mr. Stehm used the mortgage/equity technique to derive the capitalization rate used to discount the stream of income generated by the buildings. Under such method, the discount rate is calculated as a weighted average of the interest rate on debt financing and the rate of return on equity at the time of the valuation. In the instant case, Mr. Levy assumed that 70 percent of the value of the buildings would be debt financed, and that the prevailing rate for 25 year, self-amortizing mortgages at the time of the gift was 9.5 percent. Mr. Levy drew his mortgage interest figure from general market data as of December 1976. Mr. Levy also assumed that 30 percent of the value of the buildings would be equity financed, and estimated rates of return varying from 10 to 17 percent. The initial rate was further adjusted over time to take account of equity buildup occurring over the 10-year assumed holding period due to amortization of the outstanding mortgage debt. Because Mr. Levy projected that no appreciation in the value of the buildings would *571 occur over the holding period, an assumption which we find warranted based on the record, he made no further adjustment in the rate of return to take account of projected appreciation. Mr. Levy thus arrived at initial capitalization rates of 9.5 to 12 percent. Mr. Stehm's calculation of capitalization rates used somewhat different figures, but utilized the same general approach as Mr. Levy. In calculating the capitalization rate under the mortgage equity technique, Mr. Stehm assumed that 75 to 80 percent of the buildings' value would be financed at an interest rate of 9.5 to 10 percent. Mr. Stehm noted that mortgage interest rates can vary among buildings based on the individual features of property securing the mortgage. The remaining 25 to 20 percent of value would be financed by equity, the return on which Mr. Stehm estimated would be approximately .25 to 1.5 percent over the mortgage rate, with such rate actually ranging from 10.5 to 11 percent. Mr. Stehm also assumed that the buildings would appreciate in value over the 10-year assumed holding period, and reduced his capitalization rate accordingly to take account of such appreciation. Mr. Stehm also adjusted his initial *572 capitalization rate by a sinking fund factor to account for mortgage amortization and the increase in the equity over the holding period. Most of Mr. Stehm's initial capitalization rates were between 8.5 and 10 percent. After due consideration, we are persuaded by Mr. Levy's calculation of capitalization rates. We conclude that his calculation more accurately reflects the rate which would be applied by a hypothetical willing buyer as of the date of the gifts. As discussed above, we are hesitant to accept Mr. Stehm's assumption that appreciation in the buildings would occur over their projected holding period. We have relied considerably on Dr. Bienstock's expert report, in which he detailed the many adverse economic conditions which depressed the value of real estate in New York City. Accordingly, we can sufficiently justify Mr. Levy's conclusion that, due to the dismal prospects of the New York City economy at the time of the gifts, no adjustment in the capitalization rate should be made for appreciation in the buildings. Moreover, the capitalization rates used in certain bank appraisals made with respect to the buildings [11] are closer to the range of Mr. Levy's figures than *573 Mr. Stehm's, providing independent corroboration of such rates. We also note that Mr. Levy's initial capitalization rates better approximate the 1976 average capitalization rate for apartment buildings of 10.33 percent found in a study by the American Council of Life Insurance (ACLI) than do Mr. Stehm's, which were in all cases below such average. The capitalization rate selected for the office buildings, 10 percent, was also close to the 10.25-percent average rate found in an ACLI study cited by Mr. Levy. *574 Operating Expense Assumptions
Petitioners argue that Mr. Levy's stabilized expense estimates provide the best indication of what a hypothetical buyer would expect to pay to operate the buildings because they were the most recent expenses, and because such costs were rising from year to year. Respondent argues that the averages used by Mr. Stehm are appropriate because year-to-year fluctuations in expense levels can distort a ratio based only on 1 year's results. [12] While respondent's objection has merit with respect to some categories of expenses, we believe that using averages based on historical results is not appropriate for all categories of expenses. [13]
*575 With respect to certain expenses, averaging is proper due to their variability from year to year. In the instant case, Mr. Levy used averages to estimate repair, maintenance, and painting costs, and we believe such estimates are reasonable based on the record. Given the experience of rising costs noted by petitioners, a buyer would not have expected that the ratio of other operating expenses to income would remain at the 1973 to 1976 average level assumed by Mr. Stehm. Mr. Stehm's expense ratios are lower than the actual ratios for 1976 used by Mr. Levy, and, due to rounding, Mr. Stehm's ratios are sometimes lower than the actual average for such years. Petitioners point out that a property owner has little control over most operating expenses, such as real estate taxes, utilities, labor, and insurance, and must pay the market price for a quantity of goods and services which he has little power to vary. For instance, fuel prices rose substantially in the 1970's, and there was little a building owner could do to economize on fuel. New York City law required that heat be provided to tenants when the outside temperature fell below a certain level, regardless of the actual temperature *576 of the apartments, and the boilers in the buildings were controlled by devices called "Heat-Timers", which turned them on and off depending on the outside temperature. New York City Administrative Code sec. 27-2029 (1986). Use of a single year's income and expense results in applying the capitalization of income method is permissible provided such year's results are representative and provide a reliable basis for predicting future earnings. Estate of O'Connell v. Commissioner, 640 F.2d 249, 252 (9th Cir. 1981), affg. on this issue T.C. Memo. 1978-191. Based on the record in the instant case, we are convinced that the stabilized 1976 operating expenses used by Mr. Levy are representative of the expected expenses of operating the buildings. We also are convinced that such figures are more reflective of what a hypothetical willing buyer would expect to pay to operate the buildings than the averages on which Mr. Stehm relied. Mr. Stehm also relied on faulty data to corroborate his use of average expenses. Mr. Stehm checked his averages against expense ratio data for other buildings he had appraised; however, he mistakenly *577 thought such comparison data related to 1976, when in fact it reflected expenses for 1967. Accordingly, such data fails to confirm the expense ratios selected by Mr. Stehm. Other circumstances cast doubt upon Mr. Stehm's estimate of expenses and net income. In his calculations, Mr. Stehm substituted a 100-percent financing assumption for the 75 percent stated in the explanation of his method, but did not reveal this in his original report. Mr. Stehm claimed he did so in order to allow for possible uncertainties in his expense assumptions. Petitioners suggest, and we are inclined to agree, that if Mr. Stehm intended to allow for uncertainties in his figures, he should have done so by expressly adjusting them, rather than by making an unstated change in his method of calculating values. Using Mr. Stehm's stated assumptions concerning financing, income, and expense, however, showed that many of the buildings could not produce enough income to service the projected mortgage. Mr. Stehm admitted that no bank would lend the amounts he assumed on the basis of his net income projections. Mr. Stehm also admitted that banks would not lend the amounts projected in his original report *578 based on the historical income and expense data for the buildings. Petitioners also point out that certain of Mr. Stehm's proofs, in which he purports to arrive at the same conclusion of value by different methods of calculation, also utilize assumptions different from the one used in his principal method, and so fail to confirm his conclusions. On the whole, it seems to us that Mr. Stehm's stated assumptions resulted in an overvaluation of the buildings, and so we decline to accept his opinion of their value. Value of Below Market Interest Rate Mortgages
All of the buildings were encumbered by mortgages with varying interest rates and remaining terms to maturity. In valuing the buildings, however, both experts assumed that the buildings would be purchased with new mortgage financing at rates of interest prevailing at the time of the gifts, which were usually higher than the rates of the existing mortgage. Both experts recognized that, if a buyer of a property can assume a mortgage bearing a rate of interest below prevailing rates, the buyer will realize a cost saving measured by the difference in the rate payable on the assumed mortgage and the rate currently demanded *579 by lenders, and that the buyer may be willing to pay a premium to acquire the benefit of such below market financing. Both Mr. Levy and Mr. Stehm accordingly attempted to adjust the values of the buildings where appropriate to reflect such additional component of value, called a "mortgage benefit". Petitioners argue, however, that no additional increment of value attributable to mortgage benefit should be considered, because such an element of value has not been previously considered as a valuation factor and because the effect of the mortgage benefit on the value of the gifts has not been established. Respondent argues that the mortgage benefit is an identifiable component of a property's value, and that Mr. Stehm has valued it accurately. Petitioners object that the actual value of the mortgage benefit is speculative, and so no adjustment to value on its account should be made. Petitioners argue that a purchaser might not consider it worthwhile to assume an existing mortgage because of the necessity of refinancing the debt at some future, undeterminable rate. In all but one case, the existing mortgages were due to mature before the end of the assumed 10-year holding period *580 for the buildings, meaning that a hypothetical buyer would have to refinance before the time otherwise assumed under Mr. Levy's and Mr. Stehm's models. Petitioners suggest that a buyer might prefer to lock in the December 1976 prevailing rate for the assumed 25-year term of the mortgage rather than risk having to refinance at a higher rate when the existing mortgage came due. In considering the value of assuming the existing mortgage, a buyer would have to balance off the present cost savings against the extra expense he might incur by having to refinance at a potentially higher rate than that available at the end of 1976. The hypothetical buyer would have to make a prediction concerning the prevailing interest rate at the time the existing mortgage was to mature in order to determine the value of the mortgage benefit. Neither of the expert valuations attempted to consider the future behavior of interest rates. Both simply added the value of the cost savings to the value determined with the mortgage rate prevailing at the time of the gifts, in essence assuming that a buyer would be able to obtain a mortgage at such rate when the existing mortgage came due. Neither of the experts *581 verified the validity of the assumption, and Mr. Stehm admitted at trial that he could not predict what interest rates would have been at such times. Indeed, Mr. Stehm admitted that, although he had developed a value for mortgage benefit, he could not say what price a buyer would pay for it. Petitioners also point out that, because the existing mortgages were partially amortized, a buyer would have to put in more cash to acquire the buildings than if he simply obtained a new mortgage for the full 70 or 75 percent of the buildings' value, as assumed by the expert valuations. In light of the foregoing, it appears that the experts have failed to account for significant variables affecting the value of any mortgage benefit, and the methods used are insufficiently rigorous to permit us to conclude that the values assigned such mortgage benefit are the ones which would be reached by a hypothetical willing buyer and seller under the test prescribed by the regulations. Accordingly, we will not consider any mortgage benefit in valuing the gifts. Discounts for Minority Interest and Lack of Marketability
For gift tax purposes, the value of the fractional interest in the property *582 transferred, and not the value of the property as a whole, must ultimately be decided. Propstra v. United States, 680 F.2d 1248, 1251 (9th Cir. 1982); Bank of the West v. Commissioner, 93 T.C. 462, 468 (1989); Zable v. Commissioner, T.C. Memo. 1990-55; Filler v. Commissioner, T.C. Memo. 1987-468, affd. sub nom. Robino, Inc. Pension Trust v. Commissioner, 894 F.2d 342 (9th Cir. 1990). The fair market value of a fractional interest in real property cannot as a general rule be derived by simply applying the percentage of the interest in the whole to the value of the entire property. See Propstra v. United States, supra; Estate of Campanari v. Commissioner, 5 T.C. 488, 492 (1945); Estate of Henry v. Commissioner, 4 T.C. 423, 447 (1944), affd. 161 F.2d 574 (3d Cir. 1947); Estate of Haydel v. Commissioner, T.C. Memo. 1991-507, affd. without published opinion 988 F.2d 1213 (5th Cir. 1993). *583 Accordingly, we must consider whether the proportional net value of the interests in the buildings should be further adjusted to arrive at the taxable value of the gifts. Whether a discount should be allowed in arriving at the final value of the gift is a question of fact. Estate of Newhouse v. Commissioner, 94 T.C. at 249. Petitioners ask that the value of the gifts be discounted because the donees received minority interests in the buildings and because the interests transferred were not readily marketable. Petitioners offered the expert report of Mr. Gregory Vlasak to support their contention concerning the appropriate amount of discount. Respondent contends that no discount is warranted, and, in the alternative, disputes the amount of discount calculated by petitioners' expert. Petitioners point out that each discount sought is conceptually distinct and is designed to measure a different factor reducing value. Estate of Andrews v. Commissioner, 79 T.C. 938, 952-953 (1982). A minority discount for an interest in real property may be allowed on account of the lack of control which accompanies coownership. Estate of Campanari v. Commissioner, supra at 492-493. *584 However, a holder of a fractional interest in real property has the power to compel partition of property, which is not available with other types of shared ownership interests. Bittker & Lokken, Federal Income Taxation of Estates, Gifts, & Trusts, par. 135.3.4, at 135-41 (2d ed. 1993). Accordingly, Bittker and Lokken have suggested that the discount should reflect the cost of partition and the value of the interest secured thereby. Id.[14] We have on several occasions considered the cost, uncertainty, and delays attendant upon partition proceedings as the basis for allowing a discount in valuing fractional interests in real property. Estate of Pillsbury v. Commissioner, T.C. Memo. 1992-425; Estate of Wildman v. Commissioner, T.C. Memo. 1989-667; Estate of Youle v. Commissioner, T.C. Memo. 1989-138; Sels v. Commissioner, T.C. Memo. 1986-501; see also Estate of Henry v. Commissioner, supra at 477. The marketability discount, by contrast, measures the diminution in value attributable to the lack of a ready market for *585 the property. Ward v. Commissioner, 87 T.C. 78, 106-107 (1986). Accordingly, we will consider each discount separately. Minority Discount
Respondent contends that, because the donor and donees were all members of the same family, a unity of interest in the control of the buildings existed which obviated any basis for discounting the value of the gifts. Respondent notes the close and harmonious relationship between members of petitioner's family, concluding that no discount is appropriate because there was no indication that some action detrimental to any of the property *586 owners would be taken. This Court, as well as two Courts of Appeals, have rejected respondent's position that allowing a minority discount is inappropriate in valuing gifts between family members. Propstra v. United States, 680 F.2d 1248 (9th Cir. 1982); Estate of Bright v. United States, 658 F.2d 999 (5th Cir. 1981) (en banc); Estate of Andrews v. Commissioner, supra; Estate of Lee v. Commissioner, 69 T.C. 860 (1978). In the instant case, we find no basis for departing from such well-settled principle. The mere fact that all persons with ownership interests in the buildings are family members should not preclude allowance of a minority discount because the possibility of internecine bickering and dissention can never be excluded, and so it cannot be assumed that a family will always act as a unit in matters regarding the property. Citizens Bank & Trust Co. v. Commissioner, 839 F.2d 1249, 1253 (7th Cir. 1988). [15] We accordingly will proceed to consider whether a discount is warranted based on the hypothetical willing buyer/willing *587 seller standard customarily applied in valuing property.[16]Estate of Newhouse v. Commissioner, 94 T.C. at 218; Estate of Hall v. Commissioner, 92 T.C. 312, 336-337 (1989). Mr. Vlasak estimated that a 40-percent discount *588 for minority interest should be allowed in valuing the donated interests. Respondent criticizes Mr. Vlasak's analysis, and contends that no more than 15 percent should be allowed, if any. Respondent points out that, on their gift tax return, petitioners claimed only a 15-percent discount in valuing the gift for tax purposes, and that this Court in other cases generally has not allowed discounts of greater magnitude in valuing donative transfers of real estate interests. Estate of Campanari v. Commissioner, 5 T.C. 488, 492 (1945); Estate of Wildman v. Commissioner, T.C. Memo. 1989-667. Petitioners counter that this Court has allowed minority interest discounts of the magnitude advanced by Mr. Vlasak, citing Harwood v. Commissioner, 82 T.C. 239, 269 (1984), affd. without published opinion 786 F.2d 1174 (9th Cir. 1986), in which a 50-percent discount was allowed. We do not agree. The discount allowed in Harwood represents a combined reduction for both lack of marketability and minority interest and so does not furnish a basis for comparison solely as to minority *589 interest. Id. at 268. Petitioners also cite Estate of Watts v. Commissioner, T.C. Memo. 1985-595, affd. 823 F.2d 483 (11th Cir. 1987), in which a 35-percent discount was allowed, but such discount also represents a combined figure for lack of marketability and minority interest. Accordingly, such cases seem to suggest that the discount urged by petitioners is excessive, but, as the question is one of fact, we must remind the parties that the amount of discount must be decided on the basis of the record in the instant case, and not on what a court found reasonable in another case involving different evidence. In the instant case, petitioners have not presented sufficient evidence to establish that the amount of discount they seek should be taken into account in valuing the buildings. Inasmuch as we have held above that the gifts consisted of interests in real property, and not partnership interests, the expert report of Mr. Vlasak contains fundamental flaws and does not aid us in ascertaining the appropriate amount of minority discount. Mr. Vlasak did not rely on the amount of discount applicable *590 to fractional interests in real property of the type transferred in the instant case in arriving at his figure. Rather, he calculated his discount based on the value of interests in closed end investment companies, real estate investment trusts, and companies whose assets consisted substantially of real estate. Mr. Vlasak failed to demonstrate that such interests are comparable to fractional interests in real estate. An interest in real property is not comparable to the entities proffered by Mr. Vlasak because the holders of interests in such entities do not have the ability to compel partition of the buildings. Although in their partnership agreements, the donor and donees agreed not to seek partition of the buildings, such restrictions did not come into being until after the conveyances, and so do not affect the value of the interests for tax purposes. The tax is levied based on the interest the donor possessed at the time of transfer, which was an unrestricted fee interest. As discussed above, in deciding the amount of discount allowable in the instant case, we think that consideration of the power to partition is appropriate due to the effect which the cost and delay involved *591 in such a proceeding would have on value, which Mr. Vlasak has not provided. [17]
In contrast to Mr. Vlasak, Mr. Stehm valued the buildings as fractional interests in real estate. He concluded that a discount of 20 percent would be appropriate considering the minority owner's lack of control over the property and other factors. Mr. Stehm, however, only reduced the interests transferred to Richard LeFrak on such account, and did not consider a discount appropriate with respect to the interests transferred *592 to the trusts. We find that all interests transferred should be discounted equally. As for the discount claimed on petitioners' gift tax returns, it appears that such returns were prepared on the assumption that the gifts consisted of partnership interests, an assumption we have found to be erroneous. Based upon such considerations, we conclude that a 20-percent minority discount from the value of each gift to each donee is appropriate in the instant case. Discount for Lack of Marketability
Petitioners' claim that the value of the equity interests in the buildings should be reduced further by a discount for lack of marketability also rests upon the expert report of Mr. Vlasak. His report, however, is premised upon faulty assumptions which vitiate its probative value on the issue of such discount. The report is based upon the assumption that partnership interests, and not interests in real estate, were transferred by petitioner to his children. While such premise might not necessarily be fatal in all events, it does set the stage for what we find to be the fatal flaw of his valuation, namely, that the restrictions placed upon the partnership interests by the January 1, *593 1977, partnership agreements should be taken into consideration in valuing the interests transferred by petitioner. As stated above, the taxable value of a gift is measured by what the donor gave, and not what the donees received. Estate of Bright v. United States, 658 F.2d 999, 1001, 1006 (5th Cir. 1981); Connecticut Bank & Trust Co. v. United States, 439 F.2d 931, 935 (2d Cir. 1971); Goodman v. Commissioner, 156 F.2d 218, 219 (2d Cir. 1946); Ward v. Commissioner, 87 T.C. 78, 100 (1986). The interests in the buildings conveyed by petitioner were not subject to any of the restrictions on alienability considered by Mr. Vlasak. Such limitations were placed on the property by the January 1, 1977, partnership agreements, which were dated subsequent to the December 30, 1976, transfers. [18] Even if the transfers had been made on the terms recited in the partnership agreements, the valuation of the gifts would not be affected by such terms, as restrictions created by the instrument of transfer or terms of conveyance are not considered for such purposes. Citizens' Bank & Trust Co. v. Commissioner, 839 F.2d at 1252-1253. *594 Moreover, even the partnerships that were in existence before the transactions in issue did not place such limitations on the partners' interests prior to such time. Accordingly, in the instant case, we will not consider such restrictions. Mr. Vlasak considered other factors bearing on the marketability of the buildings, such as the depressed condition of the New York City real estate market at the time of the gifts. His report, however, does not attempt to allocate the amount of discount among *595 the various factors considered, and we have no way of doing so based on his report. Accordingly, we will not reduce the value of the gifts on the basis of Mr. Vlasak's report. Mr. Stehm, however, also considered the lack of marketability of the gifts in arriving at his overall discount from the appraised value of the interests transferred. He estimated that the discount applied to a minority interest for illiquidity due to its lack of marketability would be 10 percent and incorporated such amount in his overall minority discount of 30 percent. We believe, based on the record in the instant case, that some discount for lack of marketability is warranted in valuing the interests transferred by petitioner. We will accordingly allow a discount of 10 percent from the full value of each gift to each donee to be taken into account in valuing such gifts. In summary, in the instant case, we will allow a combined discount of 30 percent for minority or fractional interest and lack of marketability in valuing the buildings. To reflect the foregoing and concessions, Decision will be entered under Rule 155. Footnotes
1. All subsequent references to petitioner herein will denote petitioner Samuel J. LeFrak.↩
2. The trusts in question were the Denise Bandier Trust, the Francine LeFrak Trust, and the Jacqueline LeFrak Trust.↩
3. With respect to the two buildings in which she held a direct interest, Denise LeFrak Bandier signed the partnership agreements.↩
4. Respondent also determined that the gifts to the Jacqueline LeFrak Trust were gifts of future interests not eligible for the $ 3,000 per donee exclusion provided by sec. 2503(b). Petitioners have conceded the future interest issue.↩
5. Moreover, the simple transfer of the interests in the real estate would not in itself be sufficient to create a partnership, nor can such a share of ownership of such property be equated with a partnership interest. Mere co-ownership of property does not by itself establish the existence of a partnership. N.Y. Partnership Law sec. 11(2) (West 1988); Hahn v. Commissioner, 22 T.C. 212 (1954); Estate of Appleby v. Commissioner, 41 B.T.A. 18, 20-21 (1940), affd. sub nom. Commissioner v. Appleby's Estate, 123 F.2d 700 (2d Cir. 1941); Rizika v. Kowalsky, 138 N.Y.S.2d 711 (Sup. Ct. 1954), affd. 139 N.Y.S.2d 299 (N.Y. 1955); Sec. 1.761-1(a), Income Tax Regs. Furthermore, an interest in property as a tenant in common is significantly different from a partner's interest in partnership property. Compare In re Minton Group, 46 Bankr. 222 (Bankr. S.D.N.Y. 1985), In re Jones' Will, 117 N.E.2d 250 (N.Y. 1954) (attributes of tenancy in common), and Taylor v. Millard, 23 N.E. 376 (N.Y. 1890) with N.Y. Partnership Law sec. 51 (West 1988) and Weisinger v. Rae, 188 N.Y.S.2d 10↩ (Sup. Ct. 1959) (attributes of tenancy in partnership).
6. The evidence shows that petitioner did not intend to give his children an interest in the liquid assets of the sole proprietorships. Accordingly, petitioner would not have transferred interests in the sole proprietorships to the children.↩
7. Although there was no termination of the partnerships for tax purposes, such circumstance does not control whether a dissolution under State law occurred. Compare sec. 708(b) with N.Y. Partnership Law sec. 62. See also Reguard v. Commissioner, T.C. Memo. 1966-141↩.
8. In accounting for the gifts, loans to petitioner in the amount of the liquid assets of such partnerships were set up on their books. Respondent has not contended that, and we do not consider whether, the other partners made gifts to petitioner in the amount of their respective interests in such assets.↩
9. In valuing the gifts, we will take into account the donees' pro rata share of unsecured liabilities to third parties transferred to all 22 partnerships by petitioner. Rohmer v. Commissioner, 21 T.C. 1099, 1105↩ (1954). Such liabilities will reduce the donees' equity in the buildings before application of any discounts.
10. For one property, Mr. Stehm estimated 80-percent debt financing.↩
11. At trial, we admitted in evidence, over petitioners' objection, certain appraisals of the buildings which had been prepared by banks in connection with making mortgage loans on such buildings. On brief, petitioners ask that we reconsider such ruling, but we decline to do so. We have not, however, relied on the appraisals, except for the limited purpose of providing independent corroboration of Mr. Levy's capitalization rates. They were prepared over a period beginning in 1964 and ending in 1985, and, consequently, many of them were prepared at times far removed from the date of the gifts. Because economic conditions, and therefore the value of properties, varied appreciably over the time period during which the appraisals were made, we do not believe that they are reliable indicators of value as of the date of the gifts. Nevertheless, we note that the appraisals generally used the capitalization of income method to value the buildings, meaning that the banks did not project any increase in income over the amount estimated at the starting point of the calculation. Additionally, the capitalization rates used in the appraisals were generally closer to Mr. Levy's than Mr. Stehm's. While the appraisals' figures for gross receipts generally were closer to Mr. Levy's figures than Mr. Stehm's, it appears that such figures were based on estimates, and did not always agree with the actual results for the year the appraisal was done. Moreover, in many cases, the expense figures were significantly less than Mr. Levy's, and some were even less than Mr. Stehm's. The appraisals state that operating expenses are "estimated expenses", and it appears that the discrepancy may result from failure to use actual expenses for valuation purposes, as the experts did. The Court has previously held that, in valuing real property, a valuation based on the actual expenses of a property is preferable to one based on indirect methods of ascertaining expenses for a property. See Ambassador Apartments, Inc. v. Commissioner, 50 T.C. 236, 243 (1968), affd. 406 F.2d 288 (2d Cir. 1969). Certain other of such appraisals simply recite a value for a particular property, but provide no information as to how it was calculated. Because such appraisals do not explain the assumptions or detail the estimates of income and expense upon which they were based, we would have no means of deciding whether they represent more reliable calculations of value than offered by the parties' experts. Accordingly, we are not persuaded that the valuations yielded by the bank appraisals provide more reliable indications of value than provided in Mr. Levy's expert report.↩
12. Respondent also questions the accuracy of the expense figures offered by petitioners for the buildings, but we have not found them to be unreliable.↩
13. At trial, petitioners offered and respondent objected to the admission of certain certificates of income and expense prepared by Carol Management Co. for certain properties under its control. None of the certificates covered any of the buildings conveyed by petitioner. The certificates were prepared in connection with a property tax proceeding. We hold that such certificates are inadmissible hearsay. At any rate, petitioners are not prejudiced by our ruling, as we accept Mr. Levy's estimates of the income and expenses of the buildings.↩
14. Bittker and Lokken further suggest that, in view of such circumstances, the term "minority discount" is a misnomer, Bittker & Lokken, Federal Income Taxation of Estates, Gifts, & Trusts, par. 135.3.4, at 135-41 to 135-42 (2d ed. 1993), and we have used the term "fractional interest discount" to describe such discount. Estate of Pillsbury v. Commissioner, T.C. Memo. 1992-425↩.
15. It should be noted that, after the briefs in the instant case were filed, respondent issued Rev. Rul. 93-12, 1993-7 I.R.B. 13↩, which announced that the family relationship of the donor and donee would no longer be taken into account in valuing the transfers of minority interests for gift tax purposes and that respondent would follow the decided cases in valuing transfers between family members.
16. Respondent also argues that allowance of a minority discount is improper where it allows intrafamily transfers of property to escape taxation at less than full value. However, given the objective standard used to value gifts, respondent should address such argument to Congress, and not the courts.↩
17. We have found above that the two transfers of the two buildings held in partnerships prior to the transactions in issue should be treated as transfers of real property. If, however, such transfers are treated as the transfer of partnership interests, we still would not accept Mr. Vlasak's estimate of the minority discount to be applied. Respondent has raised a number of points showing that the entities used as the basis for calculating the discount are not comparable to the interests in such partnerships herein.↩
18. We note that the other papers connected with this transaction were executed Dec. 30, 1976, but the record does not make clear that the partnership agreements were signed on such day as well. Based on such circumstance, as well as the statement in the first return for the new partnerships that they commenced business on Jan. 1, 1977, we do not find sufficient reason to disregard the date on the face of the partnership agreements. 2647 Realty Co. v. Abrams, 524 N.Y.S.2d 168↩ (Sup. Ct. 1988).