T.C. Memo. 2020-153

UNITED STATES TAX COURT

ANTHONY M. KISSLING AND SUZANNE R. KISSLING, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 19857-10.                    Filed November 12, 2020.

Robert J. Lane, Jr., Stephen W. Kelkenberg, James M. Bandoblu, Jr.,

and William S. Turkovich, for petitioners.

Marc L. Caine, Gennady Zilberman, and Peggy Gartenbaum, for

respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

HOLMES, Judge: In 2004 the Kissling Interests, LLC contributed facade

easements on three commercial buildings to the National Architectural Trust. The

buildings were in a historic preservation district that under local law already

[*2] restricted what building owners could do with their property. This case thus poses a question of interest to donors of the subset of conservation easements that protect facades on old buildings: How does one gauge the marginal effect of the easement in light of local law?

Anthony Kissling, a member of Kissling Interests, took his distributive share of the associated charitable-contribution deduction that he and his wife claimed in part for 2004, with the remainder carried over to 2005 and 2006. The Commissioner disallowed the Kisslings' deductions in full based on his belief that the easements had no effect on the value of the properties. He also now asserts gross-valuation-misstatement penalties under section 6662(h).[1] The Kisslings disagree, and argue that the easements reduced the properties' values by small but discernible amounts.

FINDINGS OF FACT

The buildings that led to this case are all in Buffalo, New York. Buffalo was America's eighth largest city in 1900--a position held by San Diego today-- during the last great immigration boom. Its population kept growing for the first half of the twentieth century and peaked at nearly 600,000 in the 1950 census.

---

[1] All section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless we say otherwise.

[*3] Then, with the opening of the St. Lawrence Seaway, the collapse of grain milling and steelmaking, and the cratering of much of its blue-collar industry, it shrank to only 260,000 people today. When Buffalo was growing into a great city, it attracted the attention of great architects and great designers--its largest park was designed by Frederick Olmsted, its first skyscraper by Louis Sullivan, and what was for a time the largest office building in the world by D.H. Burnham & Co. Such achievements are the happy legacy of a prosperous economy.

Cities that keep booming complain about the problems of growth and find it hard to protect the best parks and buildings of their past from the pressure to redirect land to a new higher and best use. Cities that are shrinking envy them-- maintaining the infrastructure for a larger population that has vanished can lead a local government to hard choices of neglect or the imposition of tax and regulatory burdens their smaller populations cannot easily bear. And the economic outlook for Buffalo in the early 2000s showed how grim these choices could be. In 2003 then-Governor George Pataki placed the City under the control of the Buffalo Fiscal Stability Authority to put it on a path to fiscal recovery and responsibility. See Buffalo Fiscal Stability Authority Act, N.Y. Pub. Auth. Law secs. 3850-3873 (McKinney 2006); Buffalo Teachers Fed'n v. Tobe, 464 F.3d 362, 366 (2d Cir.

**[*4]** 2006).  That meant budgetary restraints,[2] and the City's preservation agencies weren't immune.

I.       Buffalo's Building Code Enforcement and Historic Preservation

Building-code enforcement and historic preservation in Buffalo is a multitiered system.  The first tier is the Buffalo Preservation Board established under chapter 337 of the Charter and Code of the City of Buffalo (City Code).  City Code section 337-3 creates a Preservation Board of eleven members--though two seats have remained empty for many years--nine of which are appointed by the City's Common Council and the Mayor, and two of which are representatives of the Buffalo and Erie County Historical Society and the Landmark Society of Niagara Frontier.  The Preservation Board is charged with, among other things,

---

[2] The Act forced the City of Buffalo to submit financial plans to the Buffalo Fiscal Authority for approval for at least four years after it became law.  See N.Y. Pub. Auth. Law secs. 3856 and 3857 (McKinney 2006); Buffalo Teachers Fed'n, 464 F.3d at 366.  The Act also imposed several financial limitations on the City: Aggregate operating expenses couldn't exceed operating revenue, see N.Y. Pub. Auth. Law sec. 3857(1); major operating funds had to be balanced, id. sec. 3857(2); and if estimated expenses or revenue changed, the mayor had to submit an updated budget, see id. sec. 3857(2)(f).

[*5] approving all certificates of appropriateness,[3] no effect,[4] and exception[5] "for the erection, alteration, restoration, renovation, relocation, demolition or site improvement of any landmark * * * or of any building, structure or site within a[] historic district when the exterior of such property would be affected."  City Code sec. 337-5(F).  In making such determinations the Preservation Board is guided by both the standards in City Code section 337 and the Secretary of the Interior's Standards for Rehabilitation and Guidelines for Rehabilitating Historic Buildings.  City Code sec. 337-20.

The Preservation Board, however, does not have any independent enforcement powers--that's where Buffalo's Department of Permits and Inspection Services (DPI) comes in, at least sometimes.  According to the current Commissioner, James Comerford, the DPI "oversee[s] all the building code

---

[3] A certificate of appropriateness is a "certificate issued by the Preservation Board * * * approving plans for alteration, construction, relocation, removal or demolition of * * * a structure within a[] historic district."  City Code sec. 337-2.

[4] A certificate of no effect is a "certificate issued by the Preservation Board * * * indicating that proposed plans hav[e] no effect on the exterior of * * * a structure within a[] historic district and that a certificate of appropriateness is not required."  City Code sec. 337-2.

[5] A certification of exception is a "certificate issued by the Preservation Board * * * approving plans for alteration, construction, removal or demolition of * * * a structure in a[] historic district where these plans do not meet the standards for a certificate of appropriateness."  City Code sec. 337-2.

[*6] enforcement in the City of Buffalo," which includes the standards enacted by the Preservation Board. The DPI issues licenses, performs demolitions, inspects properties for required permits, and reacts to complaints from the public about properties that do not comply with the building code. It also issues certificates of occupancy on all multiple-dwelling-unit buildings every three years, which are supposed to include a complete interior and exterior inspection for compliance with state and local codes. When it finds a building in violation, the DPI may withhold permits and licenses or issue letters of violation.

Even with these legal powers, the DPI still depends in large part on voluntary compliance. If a building owner disregards a letter of violation, the DPI may "write up" a lawsuit against the owner to be filed in Buffalo Housing Court. Whether to proceed with the case, however, is left up to the discretion of yet another part of Buffalo's government, the Corporation Counsel. If the Corporation Counsel brings the case and wins, the Housing Court may fine or even imprison the violator. City Code sec. 337-32.

During Buffalo's fiscal crisis in the early 2000s, this enforcement machinery became strained. Louis Petrucci gave us valuable and credible insight into the City's preservation efforts at that time. Petrucci has worked for the City of Buffalo almost continuously since 1989. During 2004 and 2005 he was the

[*7] Director of Housing, and in 2006 and 2007 he was a building inspector with the DPI. He credibly explained that the Buffalo Fiscal Stability Authority put severe budget restraints on the DPI between 2004 and 2006. He also explained that the real-estate market in Buffalo was so depressed in the early 2000s that people were buying properties in historic districts simply to speculate on the market, which meant they would "sit on them forever and ever, hoping that things would change, [and] that there'd be some grand economic development." But when that didn't occur, a great number of properties fell into disrepair as their owners let them go unmaintained.

The Preservation Board saw this problem and put together a list of "distressed" historic buildings deemed to be "at risk," which it gave to the DPI to help focus its inspections. The problem with this method was that the DPI "didn't really have a standard of what 'at risk' was." When the DPI discovered a violation, it did try to start actions against the owners in housing court. But when it did so, the DPI "received mixed results." Petrucci described the DPI's "fair amount of frustration" with the housing court because it "didn't always get what [it] wanted"--namely, having the court "force [property owners] to fix up the buildings." As he explained, "oftentimes the opposing counsel would make [a] convincing argument" for why a building should be demolished, and a housing

[*8] court judge might agree and order the buildings to "come down[,] and they came down." This was all part of the larger problem known as "demolition-by-neglect,"[6] which Petrucci acknowledged was prevalent in the early 2000s due in no small part to the fact that under the budget restraints imposed by the Buffalo Fiscal Stability Authority "[t]here was a budget for demolition, [but] not for emergency repairs on the properties or structures."

Budget restraints also affected the City's ability to conduct inspections. In 2004 Petrucci estimated that the City had only 53 to 55 building inspectors, who were each charged with performing 2,000 to 3,000 inspections per year. Inspectors would understandably give priority to inspections of new construction that aimed to protect public safety, and inspections aimed at preserving the exterior condition of historic buildings became "primarily complaint driven." Petrucci credibly testified as well that the inspectors who were left weren't "specifically trained in [Buffalo's] preservation standards" and weren't at all "trained under the Secretary of Interior standards." The City also failed to make and keep good records of the baseline conditions of historic properties, which

---

[6] Tim Tielman, a member of the Preservation Board, defined "demolition-by-neglect" as the process by which "structures deteriorate to the point where the argument is made that they ought to be demolished simply because [the] cost [is] too much to rehabilitate it or it's a danger to the public."

**[*9]** made it even more difficult for inspectors who tried to detect changes in protected buildings from year to year.[7] The result was a system of crisis management.

These difficult times began to ease after the tax years here. In 2012 the Fiscal Stability Authority moved into an advisory role, see Annual Report of the Buffalo Fiscal Stability Authority: Fiscal Year Ended June 30, 2012, at 2 (Sept. 24, 2012); Buffalo Fiscal Stability Authority, Meeting Minutes (May 29, 2012), and some of the budget pressures that had affected preservation eased as well. Already in 2007, Comerford, who had moved to the private sector, returned to government as deputy commissioner of the DPI and then commissioner in 2010.[8] By 2015 the DPI had expanded its workforce to 70 inspectors, each of whom performed "only" around 1,000 inspections per year. The DPI was also able to assign each historic district a dedicated inspector who "concentrates on * * * all

---

[7] The City did appear to have maintained something called "blue sheets," which it files when it designates a property as historic. We have one in the record. It is a one-page document, with a single grainy 4-1/2- by 3-inch photograph, with a line on which someone can classify the property's condition as either excellent, good, fair, or deteriorated. There is no evidence that the City updates these records after their creation.

[8] Comerford admitted that he was completely unfamiliar with the DPI's inspection activities before his return. To the extent the Commissioner uses his testimony as evidence of the City's enforcement efforts at the time of the easements' donations in 2004, we give his testimony no weight.

[*10] exterior property maintenance violations" and "is cognizant of the preservation issues," particularly as they relate to "historic buildings and facades."

The DPI has also started to more systematically assess historic properties' conditions and to improve reporting of noncompliant structures. Around 2006, Buffalo created the "311 system," which allows the public to report potential building-code violations. By 2015 the DPI was receiving over 20,000 complaints through this system alone. In 2010 Comerford commissioned one of his top inspectors to survey "all the preservation worthy buildings in the city" and "wr[i]te up anything that wasn't up to code" after a number of historic buildings collapsed due to neglect. That survey was finished around 2012, and was the first such list compiled by the City--although the City still did not have a "base of all the historic buildings." The City also created the "Hansen system," which "inspectors use on a daily basis [to] track their daily inspections, to track permits, [and] to track licenses." Until a permit or license is approved, or until a noncompliant property becomes compliant, the Hansen system places a red line over the property, providing inspectors a quick way to check on the status of properties. We do note, however, that the system provides limited information about historic facades--it has no information about the condition, materials used, or distinctive features of the facades of buildings within historic districts.

[*11] These changes led Comerford to conclude that the DPI's enforcement of the building code and preservation standards is better now than when he joined the department in 2007. Buffalo's housing market has also recovered, which has aided the DPI's enforcement efforts, though even with these changes demolition-by-neglect remains a substantial problem.

II.     Kissling Interests' Buffalo Real Estate Purchases

Anthony Kissling is a real-estate developer from New York City. As with all developers, Kissling searches for investments that can make him a profitable return. But New York City's real-estate market was very strong in the late '90s, and Kissling set his sights on Buffalo in the hope of "find[ing] some pretty good bargains." In 1999 Kissling Interests--of which Kissling during all relevant times held a 90% share of profit, loss, and capital--invested in its first Buffalo property. Kissling recounted his sobering views on the Buffalo real-estate market at that time, which formed the basis of his investment strategy:

> Buffalo was quite a dead city. There was nothing going on. The prices didn't go higher or lower. There were a lot more apartments than people. Every building had a lot of vacancies. No buildings were in good physical shape. The kitchens were old, floors were old. The doors didn't fit. So I began to look for good locations with the idea that I'd fix these building up and rent them out. Even if I didn't get more in rent, at least [I'd] have a fully rented building that went [sic] for the whole market to improve.

[*12] Soon after its first purchase Kissling Interests bought the three properties that are the focus of this case. Each is in the Allentown Historic District. They are

- 165 North Street (the Mansion);

- 175 North Street (the Ambassador); and

- 131 Allen Street.

Kissling Interests bought 131 Allen Street in October 1999. The property is a three-story apartment building, eclectic in style, built in the early 20th century. It has a brick facade with contrasting stone features. The front facade is eleven bays wide and is arranged symmetrically, with the main entrance centered and set slightly forward in an enclosed porch. The porch has a staggered roofline, emphasized by a thick stone trim band, and quoins.[9] The entry door is wood-paneled with small glass inserts and is flanked by single-pane sidelights. A thick stone band wraps the base of the facade, and like the porch, the building has quoins and a staggered roofline, which is raised at the corners and in the center, where a circular stone shield draws the eye.

---

[9] "Quoins" are corners of a building that are typically made of stone, or another material meant to imitate stone, dressed or arranged so as to form a decorative contrast with the adjoining walls. Quoin, American Heritage Dictionary (5th ed. 2020). Some quoins are quite elaborate and add to a building's beauty.

[*13] This was something of a distress sale. Kissling Interests bought the property from the mortgagee. M&T Bank had been unwilling to foreclose on the property even though the previous owner had disappeared and the tenants weren't paying rent, so Kissling Interests bought the mortgage at a discount, finished the foreclosure, and got the building vacant. It then began substantial renovations--it "put in new windows, redid the roof, redid the hallways, put in new kitchens and did some work in the bathrooms to all 17 apartments"--which it completed by late November 2000. The renovations enabled Kissling Interests to rent almost all of the apartments in the building.

Kissling Interests next bought the North Street properties in February 2000. 165 North[10] is a three-story apartment building, built in the early 20th century as a single-family home. It is in the Italian Renaissance style with a main entrance that is reached by a wide, circular stoop set in the center of the ground floor within a wide entry portico. The portico has a flat circular roof and grooved terra-cotta columns atop chiseled square bases. The windows across the facade are elaborately detailed and topped by heavy pediments that are straight on the ground

---

[10] While both parties stipulated that this building "occupies the tract of land generally known as 165 North Street," the property also has the address 173 North Street, which sometimes showed up in the record.

[*14] floor and arched on the second floor. The building has a rusticated limestone base with quoins at the corners and an ornate cornice.

175 North Street is a grand eight-story apartment building built in the 1920s with Renaissance Revival features. During the last Roaring '20s, it was a first-class rental building, and apartments there are again in high demand. The first two floors of the building, as well as the basement level, are rusticated limestone, while the upper floors are brick with contrasting stone detailing. The main entrance is in the center of the ground floor. The window directly above the entrance is topped by a broken arched pediment, which rests above a continuous segmented band-course and divides the second and third floors. The windows across the facade are organized symmetrically and are all of the double-hung, multipane variety with sashes and simple straight sills.

Kissling Interests bought these properties from a limited partnership in a private sale that required the unanimous agreement of about 15 partners. The buildings have more than 125 units combined, were in fairly good shape, and were almost fully rented at moderate rents at the time of purchase.

III.  Donation of Conservation Easements

In December 2003 the United States Department of the Interior certified that all three buildings are historic. Each certification states that the property

[*15] contributes to the significance of the Allentown Historic District and is a "certified historic structure" eligible for a charitable contribution for conservation purposes in accordance with the Tax Treatment Extension Act of 1980. See sec. 1.170A-14(d)(1)(iv), Income Tax Regs.

Once Kissling Interests had these certificates in hand, it contributed conservation easements on all the properties' facades to the National Architectural Trust. Kissling Interests and the Trust executed two deeds of easement--one on the North Street properties, and one on 131 Allen--which were recorded on December 13, 2004.[11] Each property was subject to a mortgage when the easements were granted, and each lender joined in the execution of the deeds of easement through lender-subordination agreements.[12]

The easements broadly define the term "facade" to include "all exterior surfaces of the improvements on the [p]roperty, including all walls, roofs, and chimneys" and state that "[i]t is the intent of the parties that the [f]acade visible

---

[11] The terms of the deeds of easement are nearly identical. As a result, when we refer to a specific term, we refer to both easements.

[12] The lender-subordination agreements may have given the lenders priority over the Trust for all insurance proceeds and proceeds of condemnation. This might have made the easement vulnerable to attack under Palmolive Bldg. Inv'rs, LLC v. Commissioner, 149 T.C. 380, 394-95 (2017). But the parties stipulated this issue away, and we won't look into it further.

**[*16]** from the street-level on the opposite side of [the property] remains essentially unchanged and in full public view." The easements also restrict what Kissling Interests can do to the properties without the Trust's consent. These restrictions include "any alteration, construction or remodeling of existing improvements * * * , or the placement * * * of signs or markers, that would materially alter or change the appearance of the [f]acade." They also restrict "exterior extensions of existing improvements * * * [and] the erection of new improvements, including an architecturally consistent [f]acade, to replace existing improvements which have been wholly or partially destroyed (e.g., by fire)." Painting or cleaning the facade also requires the Trust's consent, unless the properties had been damaged as a result of a casualty loss, destruction, or deterioration, in which case Kissling Interests may perform any necessary "maintenance, reconstruction, repair and refinishing * * * so long as it is conducted in a manner which will maintain or recreate the essential appearance of the [f]acade." Kissling Interests also promised at all times to "maintain in good order the roof, the [f]acade, the foundations and the overall structural integrity of the building" while "comply[ing] with the requirements of all applicable federal, state and local governmental laws and regulations * * * [with] attention * * *

[*17] directed to the Secretary of the Interior's Standards for Rehabilitating Historic Buildings."

The easements provided various rights to the Trust, including the right "to enter upon and inspect the [f]acade, and any improvement thereon, but not including the inside of the [b]uilding." If Kissling Interests violated the terms of the easements and failed to cure after being given notice, the Trust had the right to: (i) "institute legal proceedings to enjoin such violation * * * to require the restoration of the [p]roperty * * * to its prior condition" and seek reimbursement for legal costs and attorneys fees; (ii) "enter upon the [p]roperty and improvements thereon in order to correct such violation and * * * to hold [Kissling Interests] responsible for the cost thereof"; and (iii) place a lien on the property. And finally, if the easements are ever extinguished, whether through condemnation, judicial decree or otherwise, the Trust is entitled to receive a portion of proceeds from any sale, exchange, or conversion of the properties.[13]

---

[13] The extinguishment clause grants the Trust "a portion of the proceeds * * * equal to *the same proportion* that the value of the initial easement donation bore to the entire value of the property * * * as estimated by a state licensed appraiser." (Emphasis added.) Though the Commissioner stipulated away any potential issue related to the extinguishment clause, this doesn't run afoul of our recent decision in Oakbrook Land Holdings, LLC v. Commissioner, T.C. Memo. 2020-54.

[*18] IV.    Kissling Interests' Post-easement Relations With the Trust

Once it donated the easements, Kissling Interests had to endure the Trust's annual property inspections. These inspections are thorough and include a complete interior and exterior inspection. An inspector from the Trust takes field notes, identifies any required maintenance, and checks for any alterations that were made to the properties. If he finds any, he checks for a record of whether the Trust had approved them. The Trust also keeps baseline information from the time of the donation in the form of detailed photographs that it retakes each year to show any changes. Following its review of the field notes and the photographs, the Trust sends a letter to Kissling Interests to present its findings. If the Trust discovers a violation, it asks Kissling Interests to propose how to fix it.

We specifically find that the Trust took its responsibilities for these properties seriously. Kissling admitted that he made several changes to the properties without the Trust's consent. These were not that extraordinary--at 131 Allen he removed flowers in the front of the building, changed the awnings from green to black, and installed a vacancy sign to attract tenants. On each occasion, the Trust noted the changes, contacted Kissling Interests to demand an explanation, and then remedied the matter. There is no evidence of any such

**[*19]** correspondence or contact from the DPI or the Preservation Board about any such issues for any of the Properties.

The Trust also issued demands. The Trust wanted wires removed from the exterior of 175 North Street and required Kissling Interests to repaint the cornice. These were not expensive repairs, and Kissling could point to no increases in management, insurance, professional, or repair and maintenance costs caused by the easement during the first couple years the easement was in place.

V.      Reporting the Contribution and Audit

Kissling Interests reported a noncash charitable contribution of $855,900 attributable to the grant of the easements to the Trust on its 2004 Form 1065, U.S. Return of Partnership Income. It also issued a Schedule K-1, Partner's Share of Income, Deductions, Credits, etc., to Kissling for the 2004 tax year, which reported his distributable share of the contribution as $770,310 (90% × $855,900). The Kisslings were limited, however, in the amount of their charitable contribution deduction in 2004 by section 170(b) and had to carry forward some of the deduction to their 2005 and 2006 tax years.

The Commissioner audited all three years and completely disallowed the Kisslings' deductions for the contribution of the easements to the Trust. The

[*20] Kisslings filed a petition, and we tried the case in Buffalo.[14]  The trial was mostly a battle of experts, although the Commissioner amended his answer to assert gross valuation-misstatement penalties under section 6662(h) for tax years 2005 and 2006.

## OPINION

### I.    Qualified Conservation Contributions

Section 170 allows a taxpayer to deduct the value of any charitable contribution he makes.  There is an exception for contributions of real property, if the gift "consists of less than the * * * entire interest in such property."  Sec. 170(f)(3)(A).  There is an exception to this exception that allows a deduction for a partial interest in real property if the donation is a "qualified conservation contribution."  Sec. 170(f)(3)(B)(iii).  A "qualified conservation contribution" is "a contribution (A) of a qualified real property interest, (B) to a qualified organization, (C) exclusively for conservation purposes."  Sec. 170(h)(1).  Under section 170(h)(2)(C), a qualified real-property interest must be "a restriction (granted in perpetuity) on the use which may be made of the real property."  And section 170(h)(5)(A) tells us that "[a] contribution shall not be treated as

---

[14] The Kisslings were residents of Florida when they filed their petition. This case is therefore presumptively appealable to the Eleventh Circuit. See sec. 7482(b)(1)(A).

**[*21]** exclusively for conservation purposes unless the conservation purpose is protected in perpetuity.”

In Pine Mountain Pres., LLLP v. Commissioner, 151 T.C. 247, 280-82 (2018), aff’d in part, rev’d in part, and vacated, __ F.3d __, 2020 WL 6193897 (11th Cir. Oct. 22, 2020), we held that the retained power of all contracting parties to change contractual terms does not by itself destroy an easement’s required perpetuity. We also held there that a donor’s retained right to add improvements “appurtenant to residential development” does violate the perpetuity requirement as a matter of law when the precise location of those improvements is not set forth in the deed of easement. Id. at 275-79.

Once we decided in Pine Mountain that the power of parties to amend a deed of easement did not *ipso facto* render all donations of such easements nondeductible, this case became one of the apparently rare instances in which the only dispute is about the proper value of an easement. That’s because the parties stipulated that the deeds of easement in this case satisfy each of section 170(h)(1)’s requirements.

And so we turn to the regulations. They tell us that the value of a conservation easement is the “fair market value of the perpetual conservation restriction *at the time of the contribution*.” Sec. 1.170A-14(h)(3)(i), Income Tax

**[\*22]** Regs. (emphasis added). But in the case of contributions of real property interests, there are two potentially relevant dates for determining when the contribution was made: the grant date and the recordation date. The regulations don't expressly tell us which date to use, but they do tell us that ordinarily "a contribution is made at the time delivery is effected." Sec. 1.170A-1(b), Income Tax Regs. Whether delivery is effected is a question of state law. United States v. Nat'l Bank of Commerce, 472 U.S. 713, 722 (1985) (state law determines real-property rights, federal law determines consequences). Because the Properties are in New York, we look to its law to determine when Kissling Interests made its donations.

We've previously concluded that "[u]nder New York law, an instrument purporting to create, convey, modify, or terminate a conservation easement is not effective unless recorded." Zarlengo v. Commissioner, T.C. Memo. 2014-161, at \*21 (citing N.Y. Envtl. Conserv. Law sec. 49-0305(4) (McKinney 2008 & Supp. 2014)). The easements in this case were recorded on December 13, 2004. That sets the date on which we determine the easements' fair market value.

The regulations tell us how. They tell us that where "there is a substantial record of sales of easements comparable to the donated easement \* \* \*, the fair market value of the donated easement is based on the sales prices of such

[*23] comparable easements." Sec. 1.170A-14(h)(3)(i), Income Tax Regs. In the absence of such sales, "the fair market value of a perpetual conservation restriction is equal to the difference between the fair market value of the property it encumbers before the granting of the restriction and the fair market value of the encumbered property after the granting of the restriction." Id. This approach is known as the "before and after" approach and we have often used it. See, e.g., Hilborn v. Commissioner, 85 T.C. 677, 689 (1985); Zarlengo, T.C. Memo. 2014-161, at *41-*42; Gorra v. Commissioner, T.C. Memo. 2013-254, at *49; Simmons v. Commissioner, T.C. Memo. 2009-208, slip op. at 18-19, aff'd, 646 F.3d 6 (D.C. Cir. 2011). Under this approach, the "before" and "after" values are to reflect the property's highest and best use, which we've described as "[t]he reasonably probable and legal use of vacant land or an improved property that is physically possible, appropriately supported, and financially feasible and that results in the highest value." Whitehouse Hotel Ltd. P'ship v. Commissioner, 139 T.C. 304, 331 (2012) (quoting Appraisal Institute, The Appraisal of Real Estate 277-78 (13th ed. 2008)), aff'd in part, vacated in part, and remanded on other grounds, 755 F.3d 236 (5th Cir. 2014).

There are three widely accepted methods to value property under the "before and after" approach: (1) sales comparison, (2) income capitalization, and

**[*24]** (3) replacement cost.  The premise of the sales-comparison approach is that market value is directly related to the prices being paid for competing properties.  This requires not only that the comparable properties chosen be themselves similar to the subject property, but also that the sales occurred at arm's length and within a reasonable time of the valuation date.  See Chandler v. Commissioner, 142 T.C. 279, 285 (2014) (citing Wolfsen Land & Cattle Co. v. Commissioner, 72 T.C. 1, 19 (1979)).  The income-capitalization method measures the subject property's fair market value by the present value of the future income stream that its owners can expect to realize.  Whitehouse Hotel Ltd. P'ship, 139 T.C. at 321-322.  The focus of this method is on forecasting market income and discounting it by an appropriate capitalization rate, which (at a high level of generality) captures the risk inherent in the investment.  Id. at 322.  Finally, the replacement-cost method "derives the value of a property by estimating the reproduction or replacement cost of the improvements, deducting therefrom the estimated depreciation, and then adding the market value of the land."  Talkington v. Commissioner, T.C. Memo. 1998-412, slip op. at 22.  This method is particularly suspect when used to value older historic structures.  See Whitehouse Hotel Ltd. P'ship, 139 T.C. at 316.

We have also already recognized the special problem of owners who donate facade easements on buildings in historic-preservation districts.  The regulations

[*25] tell us that we "must take into account * * * any effect from zoning, conservation, or historic preservation laws that already restrict the property's potential highest and best use." Sec. 1.170A-14(h)(3)(ii), Income Tax Regs. This tells us to determine what protection, if any, an easement adds beyond local law.

This isn't a new problem either. See, e.g., Chandler, 142 T.C. at 280; Whitehouse Hotel Ltd. P'ship, 139 T.C. at 307-08; Kaufman v. Commissioner, T.C. Memo. 2014-52, at *2, aff'd, 784 F.3d 56 (1st Cir. 2015); Zarlengo, T.C. Memo. 2014-161; Scheidelman v. Commissioner, T.C. Memo. 2013-18, aff'd, 755 F.3d 148 (2d Cir. 2014); Gorra, T.C. Memo. 2013-254; Simmons, T.C. Memo. 2009-208. These cases show just how factbound this review is. After all, "'[v]aluation is . . . necessarily an approximation[,]' and '[i]t is not necessary that the value arrived at by the trial court be a figure as to which there is specific testimony, if it is within the range of figures that may properly be deduced from the evidence.'" Scheidelman, 755 F.3d at 151 (quoting Silverman v. Commissioner, 538 F.2d 927, 933 (2d Cir. 1976), aff'g T.C. Memo. 1974-285).

With that we turn to the experts in this case.

II. The Experts

Both parties submitted expert reports on the value of the easements. The Kisslings' experts were Jan Barenholtz, Darrel Lloyd, and Kevin Mahoney; the

[*26] Commissioner's expert was Gregory Klauk. We briefly introduce them and their approaches.

A.    Jan Barenholtz

Barenholtz works at MMJ Commercial, Inc., and Kissling first retained him at the Trust's recommendation to appraise the Properties before the easements' contribution. Barenholtz is a member of the Appraisal Institute, a highly regarded organization of appraisers, and is also certified by New York State as a general appraiser. Before he appraised the Properties here, Barenholtz had appraised more than a half dozen other facade-easement contributions, all in connection with the Trust where it was the probable donee.

Barenholtz appraised the Properties for the first time in 2004. He sent Kissling Interests letters in August 2004 that stated his opinion of the market value of the Properties before and after granting the easement as of June 29, 2004. He concluded that the highest and best use of the Properties, both before and after granting the easements, was their continued use as residential apartment buildings. To calculate the Properties' "before" or pre-easement values, Barenholtz considered but rejected the sales-comparison and replacement-cost methods and instead used the income-capitalization method. He used the Properties' historical revenue and expense information to estimate each property's net operating income

**[*27]** (NOI), which he divided by a risk-adjusted capitalization rate to arrive at a final value. After calculating the easements' before values, he then reduced them by 11% (for 131 Allen) and 12% (for the North Street properties) to arrive at their after values. He claimed in his report that those percentages were based upon "guidelines issued by the Internal Revenue Service as well as Tax Court decisions" which "suggest[ed] that the granting of historic conservation easements cause a diminution of value ranging between 10% and 15%." His analysis produced the following results:

|  | 131 Allen | North Street Properties |
| --- | --- | --- |
| Property value: pre-easement | $690,000 | $6,500,000 |
| Property value: post-easement | 614,100 | 5,720,000 |
| Value of Easement | 75,900 | 780,000 |

Barenholtz later updated his appraisals for the Properties in letters dated September 2004. These updated appraisals valued the Properties before and after the granting of the easements as of September 7, 2004. In them Barenholtz concluded that the value of the Properties and the easements "were unchanged from the values estimates as of June 29, 2004."

Barenholtz returned to the task a third time after the Commissioner examined Kissling Interests' 2004 return. During that audit the Commissioner

**[*28]** offered Kissling Interests an opportunity to present any additional appraisal information. Back came Barenholtz with addenda to his 2004 appraisals, which he sent to Kissling Interests in March 2007. In these he walked back his use of a flat percentage-off approach at calculating posteasement values. For the first time he considered the enforcement powers of the Preservation Board as compared to the powers conferred on the Trust and concluded that the easements were more restrictive and imposed more obligations than the Preservation Board. This led him to increase his estimate of several post-easement expenses, and increase the Properties' post-easement capitalization rates to reflect what he identified as increased risk. These adjustments, however, led to post-easement values that were nearly identical to the ones he'd calculated in 2004.

## B. Darryl Lloyd

At trial the Kisslings had a second expert, Darrel Lloyd of IREM Solutions, Inc. Lloyd is a certified general real-estate appraiser in both New York and Pennsylvania and has more than 30 years' experience, much of which has been in appraising properties within Buffalo's various historic districts. He has even appraised the Guaranty Building--the only other building in Buffalo with a facade easement in place.

[*29] Lloyd also valued the Properties using only the income-capitalization approach but valued them as of October 25, 2004--the date the Trust executed the easements. He calculated the Properties' NOI using market-adjusted revenue and expense information, and he also concluded that the Properties' highest and best uses, both before and after the easement, were as multifamily residential apartment complexes. Based on his analysis, Lloyd concluded that the easements reduced the fair market value of the Properties.

Like every other appraiser who testified in this case, Lloyd rejected the replacement-cost approach as unnecessarily speculative. And like Barenholtz he also rejected the sales-comparison method because of what he called a lack of "sales of similar type properties encumbered with a facade easement" and his belief that any such attempt to use this method would require "substantial adjustments of 40 [to] 50 percent." Lloyd felt that adjustments of that magnitude were "unreliable" and potentially "misleading."

C.    Kevin Mahoney

The Kisslings' third and final expert was Kevin Mahoney. Mahoney is the senior vice president and partner of Baer & Associates, LLC, a construction-consulting firm that specializes in cost estimation, condition assessments, claims analysis, and related services. Mahoney has over 30 years' experience in

[*30] construction, much of it in the Buffalo market. We recognized him as an expert in assessing building conditions and estimating the costs of historical restoration.

The focus of Mahoney's expert report was "on the comparison and differences between the City of Buffalo Preservation Board's enforcement of maintenance and preservation requirements on buildings within historic preservation districts with the requirements" of the facade easements granted to the Trust. Part of his review was to look at the deterioration of the Properties' facades and to estimate the cost of repairing them to the standards for historic buildings that the Secretary of the Interior had established. Mahoney concluded:

> The financial commitment for maintaining the historical facades of the [Properties], based simply on the requirements and history of enforcement of city code by the City of Buffalo and the Buffalo Preservation Board, would be zero; based on the requirements of the conservation easements financial requirements are assured and costs will be significant.

To the extent Mahoney directly compared the terms of the easements to Buffalo's enforcement of its preservation code to reach his final conclusion, we do not give his opinion any weight. That's because when he was retained by the Kisslings, he testified that he "had only a general concept of * * * facade easement[s]" and did not have any direct experience determining whether

[*31] particular renovations met Buffalo's preservation code. He was therefore not qualified to give an expert opinion regarding whether the easements were more or less burdensome than Buffalo's enforcement of its preservation code.

We do, however, credit the portions of his report that identified specific deterioration that occurred to the Properties' facades before Kissling Interests granted the easements to the Trust--in other words, while the Properties were solely under the City's watch--and his opinion on what it would cost to restore the Properties. Mahoney identified several elements of each building's facades that were either replaced with nonhistorical materials, repaired using nonhistorical standards, or in need of significant rehabilitation in the near future. For example, at 165 North Street, Mahoney identified areas of brick replaced with nonmatching material, terra cotta window sills replaced with modern stone sills, and terra cotta columns in need of "substantial rehabilitation or reproduction in the near future." At 175 North Street, he identified some windows replaced by nonhistorical vinyl windows with metal trim. And at 131 Allen Street, he identified windows that "appear[ed] to be of non-historic quality replacements."

D.     Gregory Klauk

The Commissioner's expert was Gregory Klauk of KLW Appraisal Group, Inc. (f.k.a. Klauk, Lloyd & Wilhelm Inc.). Klauk is also a certified general real-

[*32] estate appraiser in New York with over 30 years' experience primarily in the Buffalo market. Klauk and Lloyd were partners at Klauk, Lloyd & Wilhelm, Inc. between 1995 and 2012.

Klauk also valued the Properties using the income-capitalization method, and he also found that the Properties' highest-and-best uses, both before and after the easement, were as multifamily apartment buildings. Klauk, however, valued the Properties as of December 13, 2004--the date the easements were recorded-- and he concluded that the easements did not reduce the fair market value of the Properties at all.

Klauk was also the only expert to use the sales-comparison method. He found four properties he said were comparable to 131 Allen and five that he said were comparable to the North Street properties. Based upon his analysis, Klauk concluded that the values of 131 Allen and the North Street properties were $382,500 and $4,646,000.

We have some serious concerns about these comparable sales: None of the properties that he used was subject to a facade easement at the time of its sale, which means he couldn't perform a paired-sales analysis.[15] See Kaufman, T.C.

---

[15] A paired-sales analysis compares the fair market value of a comparable property with and without an easement. This analysis divides the fair market

(continued...)

**[\*33]** Memo. 2014-52, at \*37 (Commissioner's expert "did no sales comparison analysis to determine the postcontribution value of the property because * * * he could find no properties both burdened by a preservation restriction and sold contemporaneously with the contribution of the facade easement"). Klauk instead used the selected comparable properties to calculate pre-easement values and then begged the question of an easement's effect by concluding that the after values would remain unchanged because "there is no credible support for a Facade Easement adversely effecting the market value of a property like the subject when the property is already encumbered with Historic Preservation Restrictions." This logical flaw alone would undermine Klauk's sales-comparison analysis.

Even if it didn't, at least two of the properties Klauk used in his analysis weren't even located within a historic district. Yet nowhere in his report does Klauk make a location adjustment to account for what he claims are the burdens and costs of owning a property in a historic district because of the City's enforcement of the preservation code. Klauk acknowledged at trial, for example,

---

[15](...continued)
value of the property after it's encumbered by its fair market value before it's encumbered. The resulting fraction is then subtracted from one, producing the percentage diminution in value attributable to the easement. See Gorra, T.C. Memo. 2013-254, at \*57-\*58 (citing Strasburg v. Commissioner, T.C. Memo. 2000-94, slip op. at 12 n.8). This of course requires the use of comparable properties that are encumbered by an easement.

[*34] that 420 Jersey Street--one of the comparable properties that he used to value 131 Allen--was located outside a historic district. He made what he called "a location adjustment" but did not make an adjustment "specific to the preservation issue." His report confirms this. Klauk states there that the location adjustment to 420 Jersey is attributable to the fact that it "is in a less desirable location based on occupancy and rent levels" compared to 131 Allen but makes no mention of adjusting the value based on its location outside a historic district. This also undermines his analysis.

These were not the only problems. Klauk admitted at trial that he had been unaware that Kissling Interests substantially renovated 131 Allen before it donated the easement--which resulted in Klauk's undervaluing 131 Allen when he compared it to what he said were comparable properties. And a bigger problem in Klauk's appraisal was that so many of his comparables were so dissimilar that he had to make large or numerous adjustments. Three of the five properties that he used as comparable to the North Street properties required total net adjustments of 43.9% to 56.6%. And even though Klauk made net adjustments of only around 10% to 13% to the comparables in his 131 Allen appraisal, he had to make a number of significant adjustments to get there. As we've previously stated, "[w]hen an appraiser makes numerous adjustments to a subject property's

**[\*35]** comparables, the subject property's valuation becomes less reliable."

Chandler, 142 T.C. at 287 (affording little weight to two of the appraiser's comparables where sale price adjustments "ranged from 11.2% to 20.3% and included significant adjustments based on [the appraiser's] subjective evaluation of the properties' 'condition'").

We therefore give no weight to Klauk's sales-comparison analyses.

III. Income-Capitalization Method

Although he used the preferred income-capitalization method, we still have problems with Barenholtz's analysis. We find his testimony neither credible nor "the product of reliable principles and methods." See Fed. R. Evid. 702(c). There are several reasons for this. The first is his use of blanket diminution amounts for the values of the Properties. Even Barenholtz himself questions this method. He at first appraised the post-easement Properties simply by knocking off a percentage of their pre-easement values. He picked these percentages based on "guidelines issued by the Internal Revenue Service as well as Tax Court decisions which have established * * * that the granting of historic conservation easements cause a diminution of value ranging between 10% to 15%." Nowhere in his report does he specify what IRS guidance or Tax Court opinions he consulted, and when asked at trial he was no more specific. The Kisslings argue that Barenholtz was

**[*36]** referring to an article previously posted on the National Park Service website by Mark Primoli--an IRS employee--entitled "Facade Easement Contributions" (Primoli article). The Primoli article includes the following sentence: "Internal Revenue Service Engineers have concluded that the proper valuation of a facade easement should range from approximately 10% to 15% of the value of the property." And as to the Tax Court decisions, we suspect he was referring to a string of historic-facade easement cases, mostly out of Louisiana, in the mid-to-late '80s and early '90s. See, e.g., Hilborn, 85 T.C. at 699 (finding a 10% diminution in value); Dorsey v. Commissioner, T.C. Memo. 1990-242, 59 T.C.M. (CCH) 592, 602 (1990) (10% diminution); Nicoladis v. Commissioner, T.C. Memo. 1988-163, 55 T.C.M. (CCH) 624, 629 (1988) (10% diminution); Griffin v. Commissioner, T.C. Memo. 1989-130, 56 T.C.M. (CCH) 1560, 1564 (1989) (20% diminution), aff'd, 911 F.2d 1124 (5th Cir. 1990).

We've found such rule-of-thumb valuations unpersuasive. In Kaufman, the taxpayer's expert similarly assumed "that the percentage reduction in value of the property on account of the contribution of the facade easement to [the Trust] fell somewhere between 10% and 15%" based upon the Primoli article and Tax Court guidance. Kaufman, T.C. Memo. 2014-52, at *24-*25. We refused to accept this method. Id. at *50-*52; see also Scheidelman, T.C. Memo. 2013-18, at *14. And

[*37] even Barenholtz testified that, as of the time of the trial, this valuation technique was not appropriate.

The unreliability of deriving post-easement values by assuming that they are a percentage of pre-easement values is why Barenholtz prepared his 2007 addendum to "amplify issues relating to the diminution of value of the [Properties] * * * following the donation of a facade conservation easement." In this addendum he again calculated the Properties' post-easement values but used various expenses and capitalization rates to adjust for what he, at that point, identified as increased costs and risks associated with owning the encumbered Properties. But despite what appears to be an interesting factual analysis, Barenholtz remarkably--and not very credibly--arrived at the same post-easement values he calculated in 2004. We find the probability that this is a coincidence is close to zero, especially when acknowledging how susceptible valuations using the income-capitalization approach are to minor changes in their inputs. When Barenholtz was asked at trial what the chances of two appraisers reaching the same valuation for a property are, he responded that it would be "unusual * * * [b]ecause different appraisers have different ways of going about doing appraisals." In the same way, we find the chances of one appraiser reaching the same valuation using two distinct appraisal methods to be "unusual". We also

**[*38]** have concerns with the inputs that he used. For example, Barenholtz was the only appraiser to apply a lower "before" capitalization rate for 131 Allen (8.25%) than for the North Street properties (8.5%). He was also the only appraiser to use historical, as compared to market, rent and expense data in his model. When questioned about these choices, Barenholtz testified that he used the lower capitalization rate for 131 Allen because he believed that the North Street properties represented a greater risk to an investor in 2004 and that he used historical rents because he "wouldn't expect there to be a big difference" between them and market rents. However, he provided no further explanation for why he believed 131 Allen was less risky than the North Street properties; and while he may not have expected a large difference between historical and market data, his report fails to explain the reason for that expectation. We accord Barenholtz's report no weight.

A. <u>"Before" Valuation</u>

That leaves us with Lloyd's and Klauk's valuations. The way we analyze these appraisals is to describe them in detail and examine each point of disagreement. We then plug our findings on each contested detail back into the appraisal. The reader will be unsurprised to learn that we end up somewhere between the extremes of both valuations.

[*39] Let us begin with the summaries.  First, 131 Allen:

| | | Lloyd | | | | Klauk |
|---|---|---|---|---|---|---|
| | % | Before | % | After | % | Before/After |
| Rental revenue | | $97,620 | | $97,620 | | $101,400 |
| Laundry revenue | | 2,652 | | 2652 | | 1,326 |
| Potential gross revenue | | 100,272 | | 100,272 | | 102,726 |
| Vacancy & collection loss | 5% | (5,014) | | (5,014) | 5% | (5,136) |
| Effective gross income | | 95,258 | | 95,258 | | 97,590 |
| Operating expenses | | | | | | |
| Real estate taxes | | 6,908 | | 6,908 | | 6,576 |
| Insurance | | 1,764 | | 1,764 | | 3,400 |
| Utilities | | 12,750 | | 12,750 | | 17,170 |
| Garbage removal | | --- | | --- | | 595 |
| Repairs/maintenance | | 5,100 | | 5,610 | | 10,200 |
| Payroll | | 3,400 | | 3,400 | | --- |
| Cleaning & supplies | | 1,275 | | 1,275 | | --- |
| Snow & ground care | | --- | | --- | | 300 |
| Management fees | 5% | 4,763 | 6% | 5,716 | 6% | 5,855 |
| Advertising | | 1,700 | | 1,700 | | --- |
| Professional services | 1% | 953 | 2% | 1,905 | | 1,000 |
| Miscellaneous | | 500 | | 500 | | --- |
| Reserves for replacements | | 4,250 | | 4,250 | | 3,400 |
| Total expenses | | 43,363 | | 45,778 | | 48,496 |
| Net operating income | | 51,896 | | 49,481 | | 49,093 |
| Capitalization rate | 8.5% | | 9.25% | | 11% | |
| Value | | $610,540 | | 534,927 | | 446,303 |

And next, the North Street properties:

[*40]

| | | Lloyd | | | Klauk | |
|---|---|---|---|---|---|---|
| | % | Before | % | After | % | Before/After |
| Rental revenue | | $982,260 | | $982,260 | | $967,260 |
| Laundry revenue | | 20,436 | | 20,436 | | 9,984 |
| Beauty shop revenue | | 7,860 | | 7,860 | | 6,500 |
| Potential gross revenue | | 1,010,556 | | 1,010,556 | | 983,744 |
| Vacancy & collection loss | 5% | (50,135) | | (50,135) | 5% | (49,187) |
| Effective gross income | | 960,421 | | 960,421 | | 934,557 |
| Operating expenses | | | | | | |
| Real estate taxes | | 79,012 | | 79,012 | | 75,229 |
| Insurance | | 18,940 | | 18,940 | | 35,200 |
| Utilities | | 151,800 | | 151,800 | | 179,200 |
| Garbage removal | | --- | | --- | | --- |
| Repairs/maintenance | | 27,060 | | 32,472 | | 51,200 |
| Payroll | | 26,400 | | 26,400 | | 57,600 |
| Cleaning & supplies | | 13,200 | | 13,200 | | 27,520 |
| Contracted services | | --- | | --- | | 15,360 |
| Management fees | 5% | 48,021 | 6% | 9,604 | 6% | 56,073 |
| Advertising | | 7,920 | | 57,625 | | --- |
| Professional services | 1% | 9,604 | 2% | 19,208 | 1% | 9,346 |
| Miscellaneous | | 3,500 | | 3,500 | | 10,880 |
| Reserves for replacements | | 26,400 | | 29,700 | | 28,800 |
| Total expenses | | 411,857 | | 439,778 | | 546,408 |
| Net operating income | | 548,564 | | 520,643 | | 388,149 |
| Capitalization rate | 8.5% | | 9.25% | | 8.5% | |
| Value | | 6,453,693 | | 5,628,575 | | 4,566,457 |

[*41] The most significant difference between Lloyd's and Klauk's valuations is that Klauk concluded that the easements had no effect.  But they also disagree about the value of the Properties before the easements.  And that's where we'll start.  We note that we need not accept the values computed by either side's expert witness *in toto*, and instead "may reach our own determination of value on the basis of our analysis of the evidence in the record."  Zarlengo, T.C. Memo. 2014-161, at *46 (citing Silverman, 538 F.2d at 933).

  1. Rental Revenue

To calculate revenue, both Lloyd and Klauk compared the Properties' historical rental rates with comparable market rates.  Many of the comparable apartment rentals used in Lloyd's and Klauk's analyses were identical.  Although we find both valuations entirely reasonable, we adopt Klauk's values because he explicitly detailed each adjustment made to each comparable property's rent, while Lloyd did not.

  2. Laundry Revenue

To calculate laundry revenue, both experts assumed each unit would use the laundry appliances in the Properties' basements once per week.  Lloyd, however, assumed a per-load price of $3, while Klauk assumed a per-load price of $1.50.

**[*42]** We have nothing in the record to help us decide this minor point, and will go with Klauk's, because Kissling had the burden of proof.

### 3. Beauty Shop Revenue

This revenue flow sprang from an apartment at 175 North Street that was used as a beauty shop. Klauk refers to this revenue stream simply as "miscellaneous revenue," historically within the range of $6,000 to $7,000 per year. Lloyd identifies this revenue stream as beauty-shop rental revenue and used the actual monthly rent charged, which he also determined to be within market parameters. Lloyd was credible in his report and testimony on this point, and we find his value persuasive.

### 4. Vacancy and Collection Loss

Both experts agreed on a total vacancy and collection loss factor of 5% for the Properties. To calculate the loss for 131 Allen, Lloyd and Klauk multiplied 5% by potential gross revenue. Klauk employed the same approach for the North Street properties. Lloyd, however, without explanation applied 5% not to potential gross revenue for the North Street properties but to potential gross revenue less beauty shop revenue. We find no reason why the beauty shop cannot also experience a vacancy loss. Therefore, to calculate the loss for the properties we apply 5% to potential gross revenue.

**[*43]**     5.     Real Estate Tax

Both experts calculated this expense by examining the Properties' historical tax expense. Lloyd calculated this expense by taking the Properties' 2004 true tax expense and increasing it by 2% to account for potential inflation in the overall tax rate. Klauk, on the other hand, used the Properties' actual assessed values and tax rates for January 2005 through December 2005. As of the effective date of the valuations in 2004, the Properties' actual tax for the 2005 tax year would have been unknown. Therefore, we adopt Lloyd's estimation based on the Properties' 2004 tax as adjusted.

6.     Insurance

To calculate insurance expense, Klauk estimated the expense per unit, while Lloyd estimated the expense per square foot. Klauk's insurance expense for 131 Allen amounts to around 3.5% of his calculated effective gross income, while Lloyd's amounts to approximately 1.9% of his. The comparables in Klauk's own report show insurance expenses ranging from 0.6% to 2.9% of effective gross income. Because his values fall outside this range without explanation, and Lloyd's fall within it, we adopt Lloyd's estimates of this expense for the Properties.

**[\*44]**     7.     <u>Utilities</u>

Both experts calculated utility expenses on the assumption that the landlord was responsible for each unit's heat, water, and common-area electric.  For the Properties, Klauk adopted a higher value than Lloyd.  For 131 Allen, we find that part of this discrepancy results from Klauk's ignorance of the significant renovations made to the property before the donation of the easement.  <u>See</u> <u>supra</u> p. 34.  Lloyd expressly considered the recent renovations in his report, and we adopt his value for 131 Allen.  We also adopt Lloyd's value for the North Street properties because his report provides more detailed information than Klauk's, and his value is reasonable considering the range of historical and market data provided.

8.     <u>Garbage Removal, Snow and Ground Care,</u>
<u>and Contracted Services</u>

We've combined our discussion of these three expenses because of the different way Klauk included them in his reports.  For 131 Allen, Klauk listed garbage removal separate from snow and ground care.  For the North Street properties he included them--along with elevator servicing--under a category that he called "contracted services."  Lloyd included no such expenses.  We go with Klauk on this one and find his estimates reasonable (and in the case of snow

[*45] removal, we believe their necessity in Buffalo a subject fit for judicial notice) and based on historical and market data.  We adopt them.

### 9.    Repairs and Maintenance

To calculate this expense, Lloyd looked only at the cost of repairs and maintenance, while Klauk included janitorial and supply costs[16] for 131 Allen and the cost of supplies and decorations for the North Street properties (Lloyd considered these costs separate expense categories).  Klauk's numbers did not reflect the substantial pre-easement renovations made to 131 Allen, while Lloyd's did.  Lloyd's approach was more detailed and reasonable, and we adopt his estimates of them.

### 10.    Payroll

Both experts agree that this expense should be recognized.  Klauk did not estimate it for 131 Allen, so we adopt Lloyd's value for that building.  As for the North Street properties,  Klauk appears to have increased this expense by a certain amount of unspecified "tax and benefit expense."  It's unclear why this expense would be unique to the North Street properties and what "tax and benefit expense" includes.  We therefore adopt Lloyd's values for these properties too.

---

[16] This amount also appears to include $300 per year for snow removal and grounds care, which we've already allowed.

**[*46]**     11.     Cleaning and Supplies

For 131 Allen, Klauk included cleaning and supplies in his repairs and maintenance expense and did not have a separate category for them in his report. Since Lloyd's value is within both the historical and market ranges for such an expense, we adopt his value.

We adopt Klauk's value, however, for the North Street properties. We do this because Lloyd's value is unreasonably (and inexplicably) below the lower bound of the properties' historical expense ranges, while Klauk's market-adjusted value is squarely inside.

12.     Management Fees

The experts agree that this expense is appropriately calculated using a percentage of effective gross income but dispute what that percentage should be. Klauk says 6%, while Lloyd says 5%. The difference seems attributable to Klauk's inclusion of advertising and office-supply expenses as part of management fees. Lloyd broke those expenses out. While both approaches appear reasonable, we adopt Lloyd's because of its more granular approach. As a result, we adopt Lloyd's management-fee percentage for the Properties.

**[*47]**       13.    Advertising

Lloyd projected advertising as a separate expense.  He says the expense for 131 Allen historically ranged from $1,695 (or $100 per unit) to $2,131 (or $125 per unit), while the market's advertising expense typically ranged between $40 to $100 per unit.  Based on this, he adopted an advertising expense of $100 per unit, or $1,700 annually.  For the North Street properties, the expense historically ranged from $2,612 (or $20 per unit) to $8,500 (or $64 per unit).  This, combined with advertising expenses in similar buildings that ranged from $40 to $100, led Lloyd to adopt an advertising expense of $60 per unit, or $7,920 annually.  Since Klauk didn't separate advertising from management, we will continue to adopt the more granular approach.  We will use Lloyd's advertising expense for the properties.

       14.    Professional Services

Both experts appear to agree that the professional services expense should equal 1% of effective gross income.  We find this reasonable and adopt it.

       15.    Miscellaneous

Lloyd includes this expense for each of the Properties, while Klauk includes it only for the North Street properties.  Although Lloyd consistently applied the expense to the Properties, he provided no justification for his estimates.  Klauk's

**[\*48]** estimate, on the other hand, is supported by historical and market data. We adopt Klauk's value for the North Street properties.

### 16. Reserve for Replacements

Both experts agree that it is reasonable to include this expense as an amount a property owner would set aside to repair major structural items, such as the roof, appliances, and hot-water tanks. While both experts' values appear reasonable, Klauk performed a highly detailed breakdown of the reserve required for each item that may require replacement. It's persuasive, and we adopt it.

### 17. Capitalization Rate

To calculate the Properties' capitalization rates, both experts analyzed national rate indicators and rates derived from the local market. Each also applied the mortgage-equity band-of-investment technique, "which produces a weighted average cost of capital based on the cost of debt and equity financing for the subject property." LeFrak v. Commissioner, T.C. Memo. 1993-526, 66 T.C.M. (CCH) 1297, 1302 (1993). As a result of their analyses, both Klauk and Lloyd agree that the appropriate capitalization rate for the North Street properties is 8.5%, which we find reasonable.

They are not so agreeable about the proper capitalization rate for 131 Allen.

**[*49]** Klauk's analysis began with a review of national apartment-market capitalization rates found in the PwC Korpacz Real Estate Investor Survey (4th Quarter 2004). Because Klauk felt that "the subject is clearly *not* an institutional grade property," he was particularly interested in the survey's findings on the capitalization rates of noninstitutional properties, which "indicate[d that] a cap rate for non institutional apartment projects should range from 5.25%-10.5% with an average of 8.06%."

Klauk then proceeded to calculate the capitalization rate under the mortgage-equity technique. He assumed that 75% of the value of the building would be financed with debt and that the prevailing rate for a 10-year mortgage, amortized over 20 years, was 6%. This interest rate was based on the rates of federal Treasuries and corporate bonds of varying risk. Klauk also assumed that 25% of the value of the building would be financed with equity at a rate of 16%. He based this on his interviews with investors in Western New York who indicated that they would expect a return of 8% to 14%, while three additional, undisclosed local investors said they would expect yields between 8% and 20%. Klauk determined that the building would not increase in value over a 10-year holding period. He then weighted his value by a number of factors to arrive at a capitalization rate of 9.2%.

**[\*50]** Finally, Klauk analyzed the capitalization rates of the properties he used in his sales-comparison method, which ranged from 10.2% to 15.6%. He reasoned that the capitalization rates from the local market reflected the conditions of 131 Allen and concluded that the appropriate capitalization rate was 11%, though at trial he testified that the rate should likely be 10% after learning of the significant renovations Kissling Interests made at 131 Allen before it donated the easement.

Lloyd's analysis is quite similar to Klauk's. He started by reviewing the Realty Rates Investor Survey (4th Quarter 2014), which showed an average national capitalization rate for apartments in 2004 of 9%. He then looked at local property sales, mostly from 2001, which showed capitalization rates between 9.54% and 13.26%--although he noted that since these sale dates, both interest and capitalization rates had on average dropped.

Lloyd then calculated a capitalization rate using the mortgage-equity technique. Many of his assumptions were the same as Klauk's. For example, Lloyd assumed a loan-to-value ratio of 75%, with a 6% interest rate on a 10-year mortgage, amortized over 20 years. He also projected no appreciation in the value of the buildings over a 10-year holding period. However, he altered one important assumption about the equity yield rate, listing it at 13% compared to Klauk's 16%.

**[*51]** As a result of this change, Lloyd calculated a capitalization rate using the mortgage-equity technique of 8.25%, in contrast to Klauk's 9.20% rate.

Weighing the national and local market rates, but relying principally on the mortgage-equity technique, Lloyd finally chose a capitalization rate of 8.5% (in contrast to Klauk's final rate of 10%), which he believed was justified based on the "lower interest rate environment at the time of valuation and the subject's recent renovations."

This single number explains a great deal of the difference in Klauk's and Lloyd's analyses of 131 Allen's before value,[17] and we need to pay special attention to it.

A review of the record leads us to conclude that Lloyd's analysis is more reasonable than Klauk's. Much of the Commissioner's attack on Lloyd's appraisal springs from Lloyd's use of 8.5% for the Properties. According to the Commissioner, "there is no way the [Properties] can have the exact same capitalization rates" because the North Street properties are clearly superior to 131 Allen. He bases this belief on the fact that the two "properties at issue are significantly different in size, quality, condition, the two properties are millions of

---

[17] For example, if Lloyd adopted Klauk's capitalization rate of 10% it would change his income approach value by $91,580. And if Klauk adopted Lloyd's 8.5% rate it would change his income approach value by $86,635.

[*52] dollars apart in value, and the income potential is vastly different."

Therefore, he argues, 131 Allen must have a higher capitalization rate than the North Street properties because it presents more risk and less return, and would attract interest from different investors.

Lloyd, however, credibly explained how he arrived at his conclusions. Unlike Klauk, Lloyd "believe[d] there [was] very little risk" associated with 131 Allen in 2004 because of the recent renovations, high occupancy levels, and solid rental income. This was in contrast to the much larger North Street properties, which he felt presented a substantial risk to investors. According to Lloyd, there was "a lot of risk * * * associated with larger properties in the Buffalo market" in 2004 because investors "ha[d] to keep [them] well occupied and * * * maintain[ed]." Stated differently, although the sizes, values, and income characteristics of the Properties differ in an absolute sense, the relative risk associated with each is the same. We find this conclusion reasonable.

We also have a number of concerns with how Klauk estimated his capitalization rates. In his report Klauk selected, without any meaningful discussion, a capitalization rate nearly 3% higher than what he found to be the national average capitalization rate for noninstitutional apartment buildings. He also seemingly disregarded the 9.2% capitalization rate he calculated under the

[*53] mortgage-equity technique in favor of relying on the rates of the properties he had chosen to include in his sales-comparison method--properties that we've already found were not comparable. See supra pp. 32-35. Klauk also did not take into account the substantial renovations made at 131 Allen, which would inflate his capitalization rate under the mortgage-equity technique. And Klauk's reduction of that rate from 11% to 10% at trial, to account for the reduced risk resulting from those renovations, was done on the fly and without meaningful investigation. In all, we are left with the distinct sense that Klauk's determination of 131 Allen's "before" capitalization rate was less a result of reasoned analysis and more a result of his belief that it simply must be higher than the rate for the North Street properties. We reject Klauk's capitalization-rate analysis and adopt Lloyd's.

### B. "After" Valuation

Having analyzed the "before" valuation, we now turn to the parties' most strenuous disagreement--whether the easements actually reduced the Properties' values. After all, if the easements had no appreciable effect on the Properties' "before" values, it's irrelevant for tax purposes what those values were. The core of this dispute is whether the easements were redundant of the City's preservation laws, or whether they themselves reduced the Properties' values.

**[\*54]** The Commissioner argues that the easements have no value because their restrictions duplicate those already imposed by Buffalo's Preservation Code. He asserts that the Trust does not have monitoring or enforcement powers greater than the City's and that the Trust does not enforce the terms of the easements. He has on his side a number of recent cases in which we held that donations to the Trust of facade easements with similar restrictions on buildings in other historic districts did not reduce property values. See, e.g., Chandler, 142 T.C. 279; Kaufman, T.C. Memo. 2014-52; Scheidelman, T.C. Memo. 2013-18; Dunlap, T.C. Memo. 2012-126.

The Kisslings respond that the easements that their company granted do impose greater obligations--and thus costs--on the property owner than do those imposed by the Preservation Code. They distinguish the cases cited by the Commissioner as easements granted on personal residences, not commercial properties. And by far their most significant argument focuses on Buffalo's alleged lack of enforcement of its Preservation Code at the effective date of valuation in 2004.

[*55]       1.       <u>Restrictions Imposed:  Easements Versus Preservation Code</u>

The Kisslings identify what they claim are numerous requirements imposed by the easements that are not imposed by Buffalo's Preservation Code.  We can summarize those alleged differences in a table:

| Issue | Terms of Easement | City of Buffalo |
|---|---|---|
| Partial destruction (e.g., by fire) | Must rebuild to match | No requirement to rebuild; can demolish |
| Maintenance | | |
| Inspection frequency | Annual | None to monitor maintenance; 3-year cycle to renew certificate of occupancy; focus is on life, safety, and fire code |
| Standard | Good order protecting historical and structural integrity | Good repair to prevent deterioration |
| Dangerous conditions | Must repair to existing condition | Can order demolition |
| Authority to require maintenance | Trust has power to direct work be done, and to enter and perform work in the event of a violation of easement terms | Requires order from the Housing Court |
| Penalties | Hold owner financially accountable for costs and attorney fees, and place a lien | Fines and imprisonment not enforced for preservation |

| [*56] Inspection reports | Owner put on notice of current or pending preservation requirements | No preservation inspection reports |
|---|---|---|
| Demolition | Not permitted | Allowable on the basis of "undue hardship" resulting from lack of reasonable return, unsuitability for reasonable use, or prevention of purpose |
| Appeals | Not available | Preservation Board decisions can be appealed to Common Council |
| Durability of restrictions | Perpetual regardless of property owner | Subject to repeal or amendment |
| Definition of facade | All exterior surfaces including all walls, roofs, and chimneys | Only the front of the building, not the roof or sides |

The Commissioner attacks many of these alleged differences as either untrue or of no consequence to valuation. He has the better of the argument here. In Kaufman, T.C. Memo. 2014-52, we reviewed a Trust easement on a property in Boston's South End Historic District. The easement terms were very similar to those in this case, see id. at *5-*6, and the taxpayers made many of the same arguments for why those terms were more burdensome than the restrictions

[*57] imposed by the historic district, see id. at *56-*62. We ultimately determined that "the restrictive components of the preservation agreement [were] basically duplicative of, and not materially different from" the historic district's preservation standards. Id. at *63; see also Chandler, 142 T.C. at 290 ("We recognize technical differences between the easements and local law, but we agree with respondent's conclusion that the restrictions were practically the same"). Given the similarity between the easement restrictions and historic preservation standards in this case and those in Kaufman and Chandler, we are not persuaded that the legal distinctions identified by the Kisslings would by themselves have a material effect on the Properties' values.

        2.      Income-Producing Versus Non-Income-Producing Properties

The Kisslings nonetheless distinguish the Commissioner's cases because they all involved non-income-producing properties--in contrast with the properties in this case--and they quote our acknowledgment in Chandler that easement restrictions impair the value of "commercial property more tangibly than they impair the value of residential property." Chandler, 142 T.C. at 289.

There is some strength to this argument. The easements at issue in Kaufman and Chandler were all placed on single-family homes. The easement at issue in Scheidelman was placed on a private three-family townhouse. And the easement

**[\*58]** at issue in <u>Dunlap</u> was placed on an owner-occupied condominium. In cases that feature commercial properties, we've upheld valuations similar to the Kisslings'. <u>See, e.g.</u>, <u>Whitehouse Hotel Ltd. P'ship</u>, 139 T.C. 304; <u>Dorsey</u>, T.C. Memo. 1990-242; <u>Griffin</u>, T.C. Memo. 1989-130; <u>Losch v. Commissioner</u>, T.C. Memo. 1988-230.

The problem with this argument, however, is not deciding whether the Properties are income producing--they clearly are--but why income-producing properties are, as a general matter, more affected by conservation-easement restrictions than noncommercial properties. In <u>Chandler</u>, 142 T.C. at 289, we summarized the reason as follows:

> Commercial property derives its value from its ability to generate cashflows. For commercial property, development generally correlates with increased future cashflows. More retail space, more space for tenants, and more room for customers generally increase profitability. Restrictions on the development of commercial property reduce potential for increased future cashflows and thus diminish value.

This is in contrast to single-family homes, whose buyers--though they don't object to capital gain when they sell--typically don't do cashflow analyses when they buy. <u>See</u> <u>id.</u> In some scenarios this must be true. If, for example, Kissling Interests could otherwise have doubled the size of 131 Allen from 17 to 34 units

[*59] absent the easement, the easement would have most definitely lowered the property's value by banning this possibly more profitable use.

But as the Commissioner correctly points out, before Kissling Interests granted these easements, the Properties were legally nonconforming under Buffalo's current zoning and there was no way to expand their sizes. Both experts agreed that the easements had no effect on the Properties' highest and best uses. Lloyd, however, suggested that there may have been creative ways to expand the Properties. According to him, Kissling Interests could have requested a zoning variance from the City, or it could have converted the North Street properties to senior assisted-living facilities, which would reduce the parking-space requirements by two-thirds and thereby open a portion of the property for additional development.

We again think that the Commissioner has the better of the argument. Whether the City would grant Kissling Interests a variance on the Properties is very speculative. And whether the conversion of the North Street properties to senior-living facilities would actually increase profitability--even if one assumes some additional development--is also speculative and lacks any support in the record.

[*60] We find it more reasonable that the Properties are currently operating at their highest and best use without the potential for significant additional development. That the Properties produce income does not mean that the easements reduced their values.

### 3. Buffalo's Enforcement of Its Preservation Code

The Kisslings' final argument is about Buffalo's enforcement of its Preservation Code at the time of valuation in 2004.[18] They claim that although Buffalo had preservation standards, its economic problems made its monitoring and enforcement of those standards ineffectual. They argue that the easements to the Trust created a system of enforcement where none in fact had existed. The Commissioner strenuously disagrees. According to him, preservation standards in Buffalo are aggressively enforced, and it is the Trust that fails to enforce the terms of its easements.

We view this as a factual issue, and it is one that the Kisslings have the better of on the particular facts of this case. We need to focus on the situation when the donated easements were created back in 2004. At that time, Buffalo

---

[18] We have in the past considered a city's enforcement of its preservation codes in highly regulated markets. See e.g., Chandler, 142 T.C. at 290; Kaufman, T.C. Memo. 2014-52, at *56-*60; Dunlap, T.C. Memo. 2012-126, 2012 WL 1524660, at *19-*20.

[*61] lacked the resources to record even a baseline condition of historic properties. Without a record of what a building looked like when it became protected by the Preservation Code, the City could not judge its deterioration year by year. According to DPI Commissioner Comerford's entirely credible testimony, Buffalo still lacks such records. Almost all the witnesses agreed that demolition-by-neglect is a bigger problem in Buffalo than demolition for new development. And the number of inspectors who might have helped to prevent this was slashed by the budget constraints imposed by the Buffalo Fiscal Stability Authority. Demolition-by-neglect ran rampant at the time as speculators who had no intention of maintaining properties bought them with hope for rising property values sometime in the indefinite future. And even when the Preservation Board and the DPI brought a lawsuit in Buffalo Housing Court to require enforcement of the Preservation Code, that court would often allow demolition. All of this gives us the distinct sense that Buffalo's enforcement of its Preservation Code was not proactive, but reactive; or as Comerford put it, "crisis management."

But we need not rely on testimony and anecdotes alone, as the City's lack of enforcement was borne out by the history of the Properties in this case. According to Mahoney's report, numerous elements of the Properties' facades had either substantially deteriorated or been replaced with historically inconsistent materials

[*62] before the easements, when the Properties were subject only to the City's Preservation Code. These alterations, which appear to have gone completely unnoticed by either the DPI or the Preservation Board, support a finding that in 2004 Buffalo had understandably focused its inspectors on health and safety hazards and not on preserving its architectural legacy from better times.

There is also the testimony and past appraisals of the experts in this case. Lloyd credibly testified that in his more than 25 years of experience appraising properties in Buffalo, the fact that a property is located within one of the City's historic districts has no impact on an appraiser's valuation--a sentiment reiterated in each of his appraisal reports. Klauk seemed to (possibly inadvertently) agree. He stated in his appraisal reports that, "if this property were located in an area * * * outside an identified historic district, the easement could conceivably be cause for concern for a loss in value," but as previously discussed, see supra pp. 33-34, when Klauk used the sales-comparison method he made no adjustments even if comparable properties were outside a historic district.

Klauk's opinion that the easements duplicate local law and therefore do not reduce the Properties' values is also at odds with other appraisals he performed near the time of the easements' effective dates. In 2003 Klauk appraised two avigation easements around the Buffalo airport--one for the Niagara Frontier

**[\*63]** Transportation Authority and the other for Budget Rent-A-Car.[19] As in this case, the purpose of Klauk's appraisals was to provide a "damage estimate," or reduction in value, resulting from the easements. Despite finding in both appraisals that "[t]he impact of the avigation easement [was] not appreciably different than what already existed by virtue of the underlying zoning governing the area in and around the airport," Klauk nonetheless concluded that the easements reduced the value of one property by 10% and the other by 5%. We realize that avigation and facade easements impose different restrictions, but this kind of inconsistent reasoning does affect our perception of his credibility on this point.

We would be less comfortable with this conclusion if the Trust also seemed to be a paper tiger. But when Kissling Interests made alterations without first getting the Trust's consent, the Trust noticed the alterations and demanded a response. The record has no evidence that the City even noticed any alterations in the Properties' facades. We therefore do find that the Trust's enforcement of the

---

[19] An avigation easement restricts the height of structures on the property.

[*64] easements was much more proactive than the City's enforcement of its Preservation Code.[20]

The City's enforcement of its Preservation Code at the time of the easements' donation was largely ineffective. This means that the easements themselves imposed material restrictions that lowered the Properties' values. We now have to measure that effect.

*Repairs and Maintenance*. Lloyd increased this expense by 10% for 131 Allen and 20% for the North Street properties. Lloyd testified that the adjustments were different because 131 Allen "didn't have as much ornate detail or items that would require replacement, reproduction[,] and/or maintenance" as did the North Street properties. This is also reflected in Lloyd's appraisal reports. In his North Street Properties report, Lloyd specifically mentions that "there are ornate cast stone and building materials which require specialized skills and knowledge."

---

[20] Even if we were to find that the Trust failed to enforce the easements' terms, we question whether that would have any impact on the Properties' valuations. Because an easement is valued based on the information that could be reasonably known as of its effective date, it seems improper to factor in post-easement relations between donors and donees, unless they were foreseeable as of that date. For the same reason, we do not credit Kissling's testimony that management, insurance, professional, and repair and maintenance expenses did not increase after the easements. Not only is his testimony undercut by the record--for example, Kissling Interests did perform restoration work at the request of the Trust, see supra pp. 18-19--but we find it reasonably foreseeable to expect, as of the effective date, that such expenses would increase after the easements.

[*65] There is no such mention in his 131 Allen report. We find Lloyd's increases completely reasonable and adopt them.

*Management Fees*. For each property, Lloyd estimated an increase in management fees from 5% of effective gross income pre-easement to 6% post-easement. He wrote that this was "[d]ue to additional requirements for compliance with the provisions of the easement, including the management of additional maintenance projects and costs." We find these increases reasonable, since the record contains numerous examples of correspondence between the Trust and Kissling Interests discussing concerns noted by Trust inspectors during the annual inspections. Responding to the Trust's preservation concerns represented a foreseeable new job duty not previously required of management. We adopt Lloyd's increases.

*Professional Services*. Lloyd expected this expense to double from 1% to 2% of each property's effective gross income after the easement "[a]s a result of higher costs for engineering, architectural and legal services related to the easement." We have no explanation for why this expense would increase so much post-easement, and we find it more likely than not that the increased costs for engineering and architectural services were already included in our estimates of increases in repairs and maintenance expense. We do find it reasonable that the

**[\*66]** easements could impose additional legal costs on the donor as a result of the legal rights granted to the Trust in the event Kissling Interests violates the easements. Therefore, we find that an increase of 0.5% of effective gross income is appropriate.

*Reserves for Replacement.* Lloyd increased this expense only for the North Street properties "[d]ue to the ornate designs on the improvements" and because "there can be higher anticipated expenses associated with reproduction cost versus replacement costs." Although 131 Allen may be less ornate than the North Street properties, it's unclear to us why Lloyd would not still have increased it but by a smaller amount, as he did with the repairs and maintenance expenses. Without further explanation from Lloyd, we don't see any distinction between this increase and his increase for repairs and maintenance. We therefore do not find this increase reasonable.

*Capitalization Rate.* Lloyd increased each property's post-easement capitalization rate by 0.75%. His reports attribute these increases to the following factors:

> increased operating costs, higher risk due to less liquidity (limited market participants willing to purchase a property with a facade easement), limitation of utility to the site (no expansion or additional construction on site), potential repayment of easement value, risk of

**[\*67]** liens placed by easement holder and required lender subordination which would limit the pool of potential lenders.

We find most of these assumptions reasonable, and we also find that these factors, when viewed from the perspective of 2004, are attributable to the imposition of the easements and not local law. We find it especially persuasive that the easement's reconstruction obligation meant that the probability of demolition-by-neglect--a real possibility in the Buffalo of that time--was greatly reduced. The existence of these factors is supported in part by various interviews Klauk performed with local developers and bank officers as part of his reports. Of the four developers Klauk interviewed, three were unfamiliar with facade easements, one of whom "saw no real benefit to such a program in the Buffalo area" and another who "felt it would be a program best avoided, if it involved outside intervention." Bank officers from Wells Fargo, M&T Bank, and Northwest Savings Bank also said that the donation of a facade easement might result in variations in both the loan-to-value ratio and the loan term, with one even suggesting that he might require a personal guaranty from a prospective buyer. Because both the loan-to-value ratio and the loan term are inputs in the mortgage-equity technique, we find it more likely than not that the easements would change

[*68] the resulting capitalization rates.  We also adopt Lloyd's estimates of those increases.

IV.    Conclusion

This table summarizes our findings as to the Properties' values before and after the easement:

| | | 131 Allen | | | | 165 & 175 North | | |
|---|---|---|---|---|---|---|---|---|
| | % | Before | % | After | % | Before | % | After |
| Rental revenue | | $101,400 | | $101,400 | | $967,260 | | 967,260 |
| Laundry revenue | | 1,326 | | 1,326 | | 9,984 | | 9,984 |
| Beauty shop revenue | | --- | | --- | | 7,860 | | 7,860 |
| Gross revenue | | 102,726 | | 102,726 | | 985,104 | | 985,104 |
| Vacancy & collection loss | 5% | (5,136) | | (5,136) | 5% | (49,255) | | (49,255) |
| Effective gross income | | 97,590 | | 97,590 | | 935,849 | | 935,849 |
| Operating expenses: | | | | | | | | |
| Real estate tax | | 6,908 | | 6,908 | | 79,012 | | 79,012 |
| Insurance | | 1,764 | | 1,764 | | 18,940 | | 18,940 |
| Utilities | | 12,750 | | 12,750 | | 151,800 | | 151,800 |
| Garbage removal | | 595 | | 595 | | --- | | --- |
| Repairs/ maintenance | | 5,100 | | 5,610 | | 27,060 | | 32,472 |
| Payroll | | 3,400 | | 3,400 | | 26,400 | | 26,400 |

| **[*69]** | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Cleaning & supplies | | 1,275 | | 1,275 | | 27,520 | | 27,520 |
| Contracted services | | --- | | | | 15,360 | | 15,360 |
| Snow & ground care | | 300 | | 300 | | --- | | |
| Management fees | 5% | 4,880 | 6% | 5,855 | 5% | 46,792 | 6% | 56,151 |
| Advertising | | 1,700 | | 1,700 | | 7,920 | | 7,920 |
| Professional services | 1% | 976 | 1.5% | 1,464 | 1% | 9,358 | 1.5% | 14,038 |
| Miscellaneous | | --- | | --- | | 10,880 | | 10,880 |
| Reserves for replacements | | 3,400 | | 3,400 | | 28,800 | | 28,880 |
| Total expenses | | 43,048 | | 45,021 | | 449,842 | | 469,293 |
| Net operating income | | 54,542 | | 52,569 | | 486,007 | | 466,556 |
| Capitalization rate | 8.5% | | 9.25% | | 8.5% | | 9.25% | |
| Value | | 641,670 | | 568,314 | | 5,717,729 | | 5,043,849 |
| Decrease in value | | | | (73,356) | | | | (673,880) |

Based on our findings, we've determined that the correct total value of the easements--and resulting deduction--to Kissling Interests is $747,236 (= $73,356 + $673,880). Since Kissling held a 90% share of Kissling Interests profit, loss, and capital, the Kisslings' correct deduction is $672,512--$97,798 less than they claimed in the aggregate on their 2004, 2005, and 2006 returns (= $770,310 – $672,512). Because the value of the easements claimed on the Kisslings' returns

**[\*70]** is only 15% more than the value that we've determined to be the correct

amount, the penalties under section 6662(h) do not apply.

Decision will be entered under

Rule 155.